# MILLER *v.* CALIFORNIA

No. 70–73.   Argued January 18–19, 1972—Reargued November 7,
1972—Decided June 21, 1973

BURGER, C. J., delivered the opinion of the Court, in which WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post*, p. 37. BRENNAN, J., filed a dissenting opinion, in which STEWART and MARSHALL, JJ., joined, *post*, p. 47.

*Burton Marks* reargued the cause and filed a brief for appellant.

*Michael R. Capizzi* reargued the cause for appellee. With him on the brief was *Cecil Hicks*.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

This is one of a group of "obscenity-pornography" cases being reviewed by the Court in a re-examination of standards enunciated in earlier cases involving what Mr. Justice Harlan called "the intractable obscenity problem." *Interstate Circuit, Inc.* v. *Dallas*, 390 U. S. 676, 704 (1968) (concurring and dissenting).

Appellant conducted a mass mailing campaign to advertise the sale of illustrated books, euphemistically called "adult" material. After a jury trial, he was convicted of violating California Penal Code § 311.2 (a), a misdemeanor, by knowingly distributing obscene matter,[1]

---

*Samuel Rosenwein, A. L. Wirin, Fred Okrand, Laurence R. Sperber, Melvin L. Wulf,* and *Joel M. Gora* filed a brief for the American Civil Liberties Union of Southern California et al. as *amici curiae* urging reversal.

[1] At the time of the commission of the alleged offense, which was prior to June 25, 1969, §§ 311.2 (a) and 311 of the California Penal Code read in relevant part:

"§ 311.2 Sending or bringing into state for sale or distribution; printing, exhibiting, distributing or possessing within state

"(a) Every person who knowingly: sends or causes to be sent, or brings or causes to be brought, into this state for sale or distribution, or in this state prepares, publishes, prints, exhibits, distributes, or offers to distribute, or has in his possession with intent to dis-

and the Appellate Department, Superior Court of California, County of Orange, summarily affirmed the judgment without opinion. Appellant's conviction was spe-

tribute or to exhibit or offer to distribute, any obscene matter is guilty of a misdemeanor. . . ."

"§ 311. Definitions

"As used in this chapter:

"(a) 'Obscene' means that to the average person, applying contemporary standards, the predominant appeal of the matter, taken as a whole, is to prurient interest, i. e., a shameful or morbid interest in nudity, sex, or excretion, which goes substantially beyond customary limits of candor in description or representation of such matters and is matter which is utterly without redeeming social importance.

"(b) 'Matter' means any book, magazine, newspaper, or other printed or written material or any picture, drawing, photograph, motion picture, or other pictorial representation or any statue or other figure, or any recording, transcription or mechanical, chemical or electrical reproduction or any other articles, equipment, machines or materials.

"(c) 'Person' means any individual, partnership, firm, association, corporation, or other legal entity.

"(d) 'Distribute' means to transfer possession of, whether with or without consideration.

"(e) 'Knowingly' means having knowledge that the matter is obscene."

Section 311 (e) of the California Penal Code, *supra*, was amended on June 25, 1969, to read as follows:

"(e) 'Knowingly' means being aware of the character of the matter."

Cal. Amended Stats. 1969, c. 249, § 1, p. 598. Despite appellant's contentions to the contrary, the record indicates that the new § 311 (e) was not applied *ex post facto* to his case, but only the old § 311 (e) as construed by state decisions prior to the commission of the alleged offense. See *People* v. *Pinkus*, 256 Cal. App. 2d 941, 948–950, 63 Cal. Rptr. 680, 685–686 (App. Dept., Superior Ct., Los Angeles, 1967); *People* v. *Campise*, 242 Cal. App. 2d 905, 914, 51 Cal. Rptr. 815, 821 (App. Dept., Superior Ct., San Diego, 1966). Cf. *Bouie* v. *City of Columbia*, 378 U. S. 347 (1964). Nor did § 311.2, *supra*, as applied, create any "direct, immediate burden on the per-

cifically based on his conduct in causing five unsolicited advertising brochures to be sent through the mail in an envelope addressed to a restaurant in Newport Beach, California. The envelope was opened by the manager of the restaurant and his mother. They had not requested the brochures; they complained to the police.

The brochures advertise four books entitled "Intercourse," "Man-Woman," "Sex Orgies Illustrated," and "An Illustrated History of Pornography," and a film entitled "Marital Intercourse." While the brochures contain some descriptive printed material, primarily they consist of pictures and drawings very explicitly depicting men and women in groups of two or more engaging in a variety of sexual activities, with genitals often prominently displayed.

# I

This case involves the application of a State's criminal obscenity statute to a situation in which sexually explicit materials have been thrust by aggressive sales action upon unwilling recipients who had in no way indicated any desire to receive such materials. This Court has recognized that the States have a legitimate interest in prohibiting dissemination or exhibition of obscene material [2]

---

formance of the postal functions," or infringe on congressional commerce powers under Art. I, § 8, cl. 3. *Roth* v. *United States,* 354 U. S. 476, 494 (1957), quoting *Railway Mail Assn.* v. *Corsi,* 326 U. S. 88, 96 (1945). See also *Mishkin* v. *New York,* 383 U. S. 502, 506 (1966); *Smith* v. *California,* 361 U. S. 147, 150–152 (1959).

[2] This Court has defined "obscene material" as "material which deals with sex in a manner appealing to prurient interest," *Roth* v. *United States, supra,* at 487, but the *Roth* definition does not reflect the precise meaning of "obscene" as traditionally used in the English language. Derived from the Latin *obscaenus, ob,* to, plus *caenum,* filth, "obscene" is defined in the Webster's Third New International Dictionary (Unabridged 1969) as "1a: dis-

when the mode of dissemination carries with it a significant danger of offending the sensibilities of unwilling recipients or of exposure to juveniles. *Stanley* v. *Georgia,* 394 U. S. 557, 567 (1969); *Ginsberg* v. *New York,* 390 U. S. 629, 637–643 (1968); *Interstate Circuit, Inc.* v. *Dallas, supra,* at 690; *Redrup* v. *New York,* 386 U. S. 767, 769 (1967); *Jacobellis* v. *Ohio,* 378 U. S. 184, 195 (1964). See *Rabe* v. *Washington,* 405 U. S. 313, 317 (1972) (BURGER, C. J., concurring); *United States* v. *Reidel,* 402 U. S. 351, 360–362 (1971) (opinion of MARSHALL, J.); *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495, 502 (1952); *Breard* v. *Alexandria,* 341 U. S. 622, 644–645 (1951); *Kovacs* v. *Cooper,* 336 U. S. 77, 88–89 (1949); *Prince* v. *Massachusetts,* 321 U. S. 158, 169–170 (1944). Cf. *Butler* v. *Michigan,* 352 U. S. 380, 382–383 (1957); *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451, 464–465 (1952). It is in this context that we are called

gusting to the senses . . . b: grossly repugnant to the generally accepted notions of what is appropriate . . . 2: offensive or revolting as countering or violating some ideal or principle." The Oxford English Dictionary (1933 ed.) gives a similar definition, "[o]ffensive to the senses, or to taste or refinement; disgusting, repulsive, filthy, foul, abominable, loathsome."

The material we are discussing in this case is more accurately defined as "pornography" or "pornographic material." "Pornography" derives from the Greek (*pornè,* harlot, and *graphos,* writing). The word now means "1: a description of prostitutes or prostitution 2: a depiction (as in writing or painting) of licentiousness or lewdness: a portrayal of erotic behavior designed to cause sexual excitement." Webster's Third New International Dictionary, *supra.* Pornographic material which is obscene forms a sub-group of all "obscene" expression, but not the whole, at least as the word "obscene" is now used in our language. We note, therefore, that the words "obscene material," as used in this case, have a specific judicial meaning which derives from the *Roth* case, *i. e.,* obscene material "which deals with sex." *Roth, supra,* at 487. See also ALI Model Penal Code § 251.4 (1) "Obscene Defined." (Official Draft 1962.)

on to define the standards which must be used to identify obscene material that a State may regulate without infringing on the First Amendment as applicable to the States through the Fourteenth Amendment.

The dissent of MR. JUSTICE BRENNAN reviews the background of the obscenity problem, but since the Court now undertakes to formulate standards more concrete than those in the past, it is useful for us to focus on two of the landmark cases in the somewhat tortured history of the Court's obscenity decisions. In *Roth* v. *United States,* 354 U. S. 476 (1957), the Court sustained a conviction under a federal statute punishing the mailing of "obscene, lewd, lascivious or filthy . . ." materials. The key to that holding was the Court's rejection of the claim that obscene materials were protected by the First Amendment. Five Justices joined in the opinion stating:

> "All ideas having even the slightest redeeming social importance—unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion—have the full protection of the [First Amendment] guaranties, unless excludable because they encroach upon the limited area of more important interests. But implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance. . . . This is the same judgment expressed by this Court in *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 571–572:
>
> " ' . . . There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. *These include the lewd and obscene . . . . It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social*

*value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. . . .'* [Emphasis by Court in *Roth* opinion.]

"We hold that obscenity is not within the area of constitutionally protected speech or press." 354 U. S., at 484–485 (footnotes omitted).

Nine years later, in *Memoirs* v. *Massachusetts,* 383 U. S. 413 (1966), the Court veered sharply away from the *Roth* concept and, with only three Justices in the plurality opinion, articulated a new test of obscenity. The plurality held that under the *Roth* definition

"as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value." *Id.,* at 418.

The sharpness of the break with *Roth,* represented by the third element of the *Memoirs* test and emphasized by MR. JUSTICE WHITE's dissent, *id.,* at 460–462, was further underscored when the *Memoirs* plurality went on to state:

"The Supreme Judicial Court erred in holding that a book need not be 'unqualifiedly worthless before it can be deemed obscene.' A book cannot be proscribed unless it is found to be *utterly* without redeeming social value." *Id.,* at 419 (emphasis in original).

While *Roth* presumed "obscenity" to be "utterly without redeeming social importance," *Memoirs* required

that to prove obscenity it must be affirmatively established that the material is *"utterly* without redeeming social value." Thus, even as they repeated the words of *Roth,* the *Memoirs* plurality produced a drastically altered test that called on the prosecution to prove a negative, *i. e.,* that the material was *"utterly* without redeeming social value"—a burden virtually impossible to discharge under our criminal standards of proof. Such considerations caused Mr. Justice Harlan to wonder if the *"utterly* without redeeming social value" test had any meaning at all. See *Memoirs* v. *Massachusetts, id.,* at 459 (Harlan, J., dissenting). See also *id.,* at 461 (WHITE, J., dissenting); *United States* v. *Groner,* 479 F. 2d 577, 579–581 (CA5 1973).

Apart from the initial formulation in the *Roth* case, no majority of the Court has at any given time been able to agree on a standard to determine what constitutes obscene, pornographic material subject to regulation under the States' police power. See, *e. g., Redrup* v. *New York,* 386 U. S., at 770–771. We have seen "a variety of views among the members of the Court unmatched in any other course of constitutional adjudication." *Interstate Circuit, Inc.* v. *Dallas,* 390 U. S., at 704–705 (Harlan, J., concurring and dissenting) (footnote omitted).[3] This is not remarkable, for in the area

---

[3] In the absence of a majority view, this Court was compelled to embark on the practice of summarily reversing convictions for the dissemination of materials that at least five members of the Court, applying their separate tests, found to be protected by the First Amendment. *Redrup* v. *New York,* 386 U. S. 767 (1967). Thirty-one cases have been decided in this manner. Beyond the necessity of circumstances, however, no justification has ever been offered in support of the *Redrup* "policy." See *Walker* v. *Ohio,* 398 U. S. 434–435 (1970) (dissenting ·opinions of BURGER, C. J., and Harlan, J.). The *Redrup* procedure has cast us in the role of an unreviewable board of censorship for the 50 States, subjectively judging each piece of material brought· before us.

of freedom of speech and press the courts must always remain sensitive to any infringement on genuinely serious literary, artistic, political, or scientific expression. This is an area in which there are few eternal verities.

The case we now review was tried on the theory that the California Penal Code § 311 approximately incorporates the three-stage *Memoirs* test, *supra*. But now the *Memoirs* test has been abandoned as unworkable by its author,[4] and no Member of the Court today supports the *Memoirs* formulation.

## II

This much has been categorically settled by the Court, that obscene material is unprotected by the First Amendment. *Kois* v. *Wisconsin*, 408 U. S. 229 (1972); *United States* v. *Reidel*, 402 U. S., at 354; *Roth* v. *United States*, *supra*, at 485.[5] "The First and Fourteenth Amendments have never been treated as absolutes [footnote omitted]." *Breard* v. *Alexandria*, 341 U. S., at 642, and cases cited. See *Times Film Corp.* v. *Chicago*, 365 U. S. 43, 47–50 (1961); *Joseph Burstyn, Inc.* v. *Wilson*, 343 U. S., at 502. We acknowledge, however, the inherent dangers of undertaking to regulate any form of expression. State statutes designed to regulate obscene materials must be

---

[4] See the dissenting opinion of MR. JUSTICE BRENNAN in *Paris Adult Theatre I* v. *Slaton, post*, p. 73.

[5] As Mr. Chief Justice Warren stated, dissenting, in *Jacobellis* v. *Ohio*, 378 U. S. 184, 200 (1964):

"For all the sound and fury that the *Roth* test has generated, it has not been proved unsound, and I believe that we should try to live with it—at least until a more satisfactory definition is evolved. No government—be it federal, state, or local—should be forced to choose between repressing all material, including that within the realm of decency, and allowing unrestrained license to publish any material, no matter how vile. There must be a rule of reason in this as in other areas of the law, and we have attempted in the *Roth* case to provide such a rule."

carefully limited. See *Interstate Circuit, Inc.* v. *Dallas, supra,* at 682–685. As a result, we now confine the permissible scope of such regulation to works which depict or describe sexual conduct. That conduct must be specifically defined by the applicable state law, as written or authoritatively construed.[6] A state offense must also be limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value.

The basic guidelines for the trier of fact must be: (a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest, *Kois* v. *Wisconsin, supra,* at 230, quoting *Roth* v. *United States, supra,* at 489; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. We do not adopt as a constitutional standard the *"utterly* without redeeming social value" test of *Memoirs* v. *Massachusetts,*

---

[6] See, *e. g.,* Oregon Laws 1971, c. 743, Art. 29, §§ 255–262, and Hawaii Penal Code, Tit. 37, §§ 1210–1216, 1972 Hawaii Session Laws, Act 9, c. 12, pt. II, pp. 126–129, as examples of state laws directed at depiction of defined physical conduct, as opposed to expression. Other state formulations could be equally valid in this respect. In giving the Oregon and Hawaii statutes as examples, we do not wish to be understood as approving of them in all other respects nor as establishing their limits as the extent of state power.

We do not hold, as MR. JUSTICE BRENNAN intimates, that all States other than Oregon must now enact new obscenity statutes. Other existing state statutes, as construed heretofore or hereafter, may well be adequate. See *United States* v. *12 200-ft. Reels of Film, post,* at 130 n. 7.

383 U. S., at 419; that concept has never commanded the adherence of more than three Justices at one time.[7] See *supra*, at 21. If a state law that regulates obscene material is thus limited, as written or construed, the First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected by the ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary. See *Kois* v. *Wisconsin, supra,* at 232; *Memoirs* v. *Massachusetts, supra,* at 459–460 (Harlan, J., dissenting); *Jacobellis* v. *Ohio,* 378 U. S., at 204 (Harlan, J., dissenting); *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 284–285 (1964); *Roth* v. *United States, supra,* at 497–498 (Harlan, J., concurring and dissenting).

We emphasize that it is not our function to propose regulatory schemes for the States. That must await their concrete legislative efforts. It is possible, however, to give a few plain examples of what a state statute could define for regulation under part (b) of the standard announced in this opinion, *supra:*

(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.

(b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals.

Sex and nudity may not be exploited without limit by films or pictures exhibited or sold in places of public accommodation any more than live sex and nudity can

---

[7] "A quotation from Voltaire in the flyleaf of a book will not constitutionally redeem an otherwise obscene publication . . . ." *Kois* v. *Wisconsin,* 408 U. S. 229, 231 (1972). See *Memoirs* v. *Massachusetts,* 383 U. S. 413, 461 (1966) (WHITE, J., dissenting). We also reject, as a constitutional standard, the ambiguous concept of "social importance." See *id.,* at 462 (WHITE, J., dissenting).

be exhibited or sold without limit in such public places.[8] At a minimum, prurient, patently offensive depiction or description of sexual conduct must have serious literary, artistic, political, or scientific value to merit First Amendment protection. See *Kois* v. *Wisconsin, supra,* at 230–232; *Roth* v. *United States, supra,* at 487; *Thornhill* v. *Alabama,* 310 U. S. 88, 101–102 (1940). For example, medical books for the education of physicians and related personnel necessarily use graphic illustrations and descriptions of human anatomy. In resolving the inevitably sensitive questions of fact and law, we must continue to rely on the jury system, accompanied by the safeguards that judges, rules of evidence, presumption of innocence, and other protective features provide, as we do with rape, murder, and a host of other offenses against society and its individual members.[9]

MR. JUSTICE BRENNAN, author of the opinions of the Court, or the plurality opinions, in *Roth* v. *United States, supra; Jacobellis* v. *Ohio, supra; Ginzburg* v. *United*

---

[8] Although we are not presented here with the problem of regulating lewd public conduct itself, the States have greater power to regulate nonverbal, physical conduct than to suppress depictions or descriptions of the same behavior. In *United States* v. *O'Brien,* 391 U. S. 367, 377 (1968), a case not dealing with obscenity, the Court held a State regulation of conduct which itself embodied both speech and nonspeech elements to be "sufficiently justified if . . . it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." See *California* v. *LaRue,* 409 U. S. 109, 117–118 (1972).

[9] The mere fact juries may reach different conclusions as to the same material does not mean that constitutional rights are abridged. As this Court observed in *Roth* v. *United States,* 354 U. S., at 492 n. 30, "it is common experience that different juries may reach different results under any criminal statute. That is one of the consequences we accept under our jury system. Cf. *Dunlop* v. *United States,* 165 U. S. 486, 499–500."

*States,* 383 U. S. 463 (1966), *Mishkin* v. *New York,* 383 U. S. 502 (1966); and *Memoirs* v. *Massachusetts, supra,* has abandoned his former position and now maintains that no formulation of this Court, the Congress, or the States can adequately distinguish obscene material unprotected by the First Amendment from protected expression, *Paris Adult Theatre I* v. *Slaton, post,* p. 73 (BRENNAN, J., dissenting). Paradoxically, MR. JUSTICE BRENNAN indicates that suppression of unprotected obscene material is permissible to avoid exposure to unconsenting adults, as in this case, and to juveniles, although he gives no indication of how the division between protected and nonprotected materials may be drawn with greater precision for these purposes than for regulation of commercial exposure to consenting adults only. Nor does he indicate where in the Constitution he finds the authority to distinguish between a willing "adult" one month past the state law age of majority and a willing "juvenile" one month younger.

Under the holdings announced today, no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive "hard core" sexual conduct specifically defined by the regulating state law, as written or construed. We are satisfied that these specific prerequisites will provide fair notice to a dealer in such materials that his public and commercial activities may bring prosecution. See *Roth* v. *United States, supra,* at 491–492. Cf. *Ginsberg* v. *New York,* 390 U. S., at 643.[10] If

---

[10] As MR. JUSTICE BRENNAN stated for the Court in *Roth* v. *United States, supra,* at 491–492:

"Many decisions have recognized that these terms of obscenity statutes are not precise. [Footnote omitted.] This Court, however, has consistently held that lack of precision is not itself offensive to the requirements of due process. '. . . [T]he Constitution does not require impossible standards'; all that is required is that the

28

the inability to define regulated materials with ultimate, god-like precision altogether removes the power of the States or the Congress to regulate, then "hard core" pornography may be exposed without limit to the juvenile, the passerby, and the consenting adult alike, as, indeed, MR. JUSTICE DOUGLAS contends. As to MR. JUSTICE DOUGLAS' position, see *United States* v. *Thirty-seven Photographs,* 402 U. S. 363, 379–380 (1971) (Black, J., joined by DOUGLAS, J., dissenting); *Ginzburg* v. *United States, supra,* at 476, 491–492 (Black, J., and DOUGLAS, J., dissenting); *Jacobellis* v. *Ohio, supra,* at 196 (Black, J., joined by DOUGLAS, J., concurring); *Roth, supra,* at 508–514 (DOUGLAS, J., dissenting). In this belief, however, MR. JUSTICE DOUGLAS now stands alone.

MR. JUSTICE BRENNAN also emphasizes "institutional stress" in justification of his change of view. Noting that "[t]he number of obscenity cases on our docket gives ample testimony to the burden that has been placed upon this Court," he quite rightly remarks that the examination of contested materials "is hardly a source of edification to the members of this Court." *Paris Adult*

---

language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. . . .' *United States* v. *Petrillo,* 332 U. S. 1, 7–8. These words, applied according to the proper standard for judging obscenity, already discussed, give adequate warning of the conduct proscribed and mark '. . . boundaries sufficiently distinct for judges and juries fairly to administer the law . . . . That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense. . . .' *Id.,* at 7. See also *United States* v. *Harriss,* 347 U. S. 612, 624, n. 15; *Boyce Motor Lines, Inc.* v. *United States,* 342 U. S. 337, 340; *United States* v. *Ragen,* 314 U. S. 513, 523–524; *United States* v. *Wurzbach,* 280 U. S. 396; *Hygrade Provision Co.* v. *Sherman,* 266 U. S. 497; *Fox* v. *Washington,* 236 U. S. 273; *Nash* v. *United States,* 229 U. S. 373."

*Theatre I* v. *Slaton, post,* at 92, 93. He also notes, and we agree, that "uncertainty of the standards creates a continuing source of tension between state and federal courts . . . ." "The problem is . . . that one cannot say with certainty that material is obscene until at least five members of this Court, applying inevitably obscure standards, have pronounced it so." *Id.,* at 93, 92.

It is certainly true that the absence, since *Roth,* of a single majority view of this Court as to proper standards for testing obscenity has placed a strain on both state and federal courts. But today, for the first time since *Roth* was decided in 1957, a majority of this Court has agreed on concrete guidelines to isolate "hard core" pornography from expression protected by the First Amendment. Now we may abandon the casual practice of *Redrup* v. *New York,* 386 U. S. 767 (1967), and attempt to provide positive guidance to federal and state courts alike.

This may not be an easy road, free from difficulty. But no amount of "fatigue" should lead us to adopt a convenient "institutional" rationale—an absolutist, "anything goes" view of the First Amendment—because it will lighten our burdens.[11] "Such an abnegation of judicial supervision in this field would be inconsistent with our duty to uphold the constitutional guarantees." *Jacobellis* v. *Ohio, supra,* at 187–188 (opinion of BRENNAN, J.). Nor should we remedy "tension between state and federal courts" by arbitrarily depriving the States of a power reserved to them under the Constitution, a power which they have enjoyed and exercised continuously from before the adoption of the First Amendment to this day. See *Roth* v. *United States, supra,* at 482–485. "Our duty admits of no 'substitute for facing up

---

[11] We must note, in addition, that any assumption concerning the relative burdens of the past and the probable burden under the standards now adopted is pure speculation.

to the tough individual problems of constitutional judgment involved in every obscenity case.' [*Roth* v. *United States, supra,* at 498]; see *Manual Enterprises, Inc.* v. *Day,* 370 U. S. 478, 488 (opinion of Harlan, J.) [footnote omitted]." *Jacobellis* v. *Ohio, supra,* at 188 (opinion of BRENNAN, J.).

### III.

Under a National Constitution, fundamental First Amendment limitations on the powers of the States do not vary from community to community, but this does not mean that there are, or should or can be, fixed, uniform national standards of precisely what appeals to the "prurient interest" or is "patently offensive." These are essentially questions of fact, and our Nation is simply too big and too diverse for this Court to reasonably expect that such standards could be articulated for all 50 States in a single formulation, even assuming the prerequisite consensus exists. When triers of fact are asked to decide whether "the average person, applying contemporary community standards" would consider certain materials "prurient," it would be unrealistic to require that the answer be based on some abstract formulation. The adversary system, with lay jurors as the usual ultimate factfinders in criminal prosecutions, has historically permitted triers of fact to draw on the standards of their community, guided always by limiting instructions on the law. To require a State to structure obscenity proceedings around evidence of a *national* "community standard" would be an exercise in futility.

As noted before, this case was tried on the theory that the California obscenity statute sought to incorporate the tripartite test of *Memoirs*. This, a "national" standard of First Amendment protection enumerated by a plurality of this Court, was correctly regarded at the time of trial as limiting state prosecution under the controlling case

law. The jury, however, was explicitly instructed that, in determining whether the "dominant theme of the material as a whole . . . appeals to the prurient interest" and in determining whether the material "goes substantially beyond customary limits of candor and affronts contemporary community standards of decency," it was to apply "contemporary community standards of the State of California."

During the trial, both the prosecution and the defense assumed that the relevant "community standards" in making the factual determination of obscenity were those of the State of California, not some hypothetical standard of the entire United States of America. Defense counsel at trial never objected to the testimony of the State's expert on community standards [12] or to the instructions of the trial judge on "statewide" standards. On appeal to the Appellate Department, Superior Court of California, County of Orange, appellant for the first time contended that application of state, rather than national, standards violated the First and Fourteenth Amendments.

We conclude that neither the State's alleged failure to offer evidence of "national standards," nor the trial court's charge that the jury consider state community standards, were constitutional errors. Nothing in the First Amendment requires that a jury must consider hypothetical and unascertainable "national standards" when attempting to determine whether certain materials are obscene as a mat-

[12] The record simply does not support appellant's contention, belatedly raised on appeal, that the State's expert was unqualified to give evidence on California "community standards." The expert, a police officer with many years of specialization in obscenity offenses, had conducted an extensive statewide survey and had given expert evidence on 26 occasions in the year prior to this trial. Allowing such expert testimony was certainly not constitutional error. Cf. *United States* v. *Augenblick*, 393 U. S. 348, 356 (1969).

ter of fact. Mr. Chief Justice Warren pointedly commented in his dissent in *Jacobellis* v. *Ohio, supra,* at 200:

"It is my belief that when the Court said in *Roth* that obscenity is to be defined by reference to 'community standards,' it meant community standards—not a national standard, as is sometimes argued. I believe that there is no provable 'national standard' . . . . At all events, this Court has not been able to enunciate one, and it would be unreasonable to expect local courts to divine one."

It is neither realistic nor constitutionally sound to read the First Amendment as requiring that the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las Vegas, or New York City.[13]

---

[13] In *Jacobellis* v. *Ohio*, 378 U. S. 184 (1964), two Justices argued that application of "local" community standards would run the risk of preventing dissemination of materials in some places because sellers would be unwilling to risk criminal conviction by testing variations in standards from place to place. *Id.*, at 193–195 (opinion of BRENNAN, J., joined by Goldberg, J.). The use of "national" standards, however, necessarily implies that materials found tolerable in some places, but not under the "national" criteria, will nevertheless be unavailable where they are acceptable. Thus, in terms of danger to free expression, the potential for suppression seems at least as great in the application of a single nationwide standard as in allowing distribution in accordance with local tastes, a point which Mr. Justice Harlan often emphasized. See *Roth* v. *United States*, 354 U. S., at 506.

Appellant also argues that adherence to a "national standard" is necessary "in order to avoid unconscionable burdens on the free flow of interstate commerce." As noted *supra*, at 18 n. 1, the application of domestic state police powers in this case did not intrude on any congressional powers under Art. I, § 8, cl. 3, for there is no indication that appellant's materials were ever distributed interstate. Appellant's argument would appear without substance in any event. Obscene material may be validly regulated by a State in the exercise of its traditional local power to protect the

See *Hoyt* v. *Minnesota,* 399 U. S. 524–525 (1970) (BLACK-MUN, J., dissenting); *Walker* v. *Ohio,* 398 U. S. 434 (1970) (BURGER, C. J., dissenting); *id.,* at 434–435 (Harlan, J., dissenting); *Cain* v. *Kentucky,* 397 U. S. 319 (1970) (BURGER, C. J., dissenting); *id.,* at 319–320 (Harlan, J., dissenting); *United States* v. *Groner,* 479 F. 2d, at 581–583; O'Meara & Shaffer, Obscenity in The Supreme Court: A Note on *Jacobellis* v. *Ohio,* 40 Notre Dame Law. 1, 6–7 (1964). See also *Memoirs* v. *Massachusetts,* 383 U. S., at 458 (Harlan, J., dissenting); *Jacobellis* v. *Ohio, supra,* at 203–204 (Harlan, J., dissenting); *Roth* v. *United States, supra,* at 505–506 (Harlan, J., concurring and dissenting). People in different States vary in their tastes and attitudes, and this diversity is not to be strangled by the absolutism of imposed uniformity. As the Court made clear in *Mishkin* v. *New York,* 383 U. S., at 508–509, the primary concern with requiring a jury to apply the standard of "the average person, applying contemporary community standards" is to be certain that, so far as material is not aimed at a deviant group, it will be judged by its impact on an average person, rather than a particularly susceptible or sensitive person—or indeed a totally insensitive one. See *Roth* v. *United States, supra,* at 489. Cf. the now discredited test in *Regina* v. *Hicklin,* [1868] L. R. 3 Q. B. 360. We hold that the requirement that the jury evaluate the materials with reference to "contemporary

general welfare of its population despite some possible incidental effect on the flow of such materials across state lines. See, *e. g., Head* v. *New Mexico Board,* 374 U. S. 424 (1963); *Huron Portland Cement Co.* v. *Detroit,* 362 U. S. 440 (1960); *Breard* v. *Alexandria,* 341 U. S. 622 (1951); *H. P. Hood & Sons* v. *Du Mond,* 336 U. S. 525 (1949); *Southern Pacific Co.* v. *Arizona,* 325 U. S. 761 (1945); *Baldwin* v. *G. A. F. Seelig, Inc.,* 294 U. S. 511 (1935); *Sligh* v. *Kirkwood,* 237 U. S. 52 (1915).

34

standards of the State of California" serves this protective purpose and is constitutionally adequate.[14]

## IV

The dissenting Justices sound the alarm of repression. But, in our view, to equate the free and robust exchange of ideas and political debate with commercial exploitation of obscene material demeans the grand conception of the First Amendment and its high purposes in the historic struggle for freedom. It is a "misuse of the great guarantees of free speech and free press . . . ." *Breard* v. *Alexandria*, 341 U. S., at 645. The First Amendment protects works which, taken as a whole, have serious literary, artistic, political, or scientific value, regardless of whether the government or a majority of the people approve of the ideas these works represent. "The protection given speech and press was fashioned to assure unfettered interchange of *ideas* for the bringing about of

[14] Appellant's jurisdictional statement contends that he was subjected to "double jeopardy" because a Los Angeles County trial judge dismissed, before trial, a prior prosecution based on the same brochures, but apparently alleging exposures at a different time in a different setting. Appellant argues that once material has been found not to be obscene in one proceeding, the State is "collaterally estopped" from ever alleging it to be obscene in a different proceeding. It is not clear from the record that appellant properly raised this issue, better regarded as a question of procedural due process than a "double jeopardy" claim, in the state courts below. Appellant failed to address any portion of his brief on the merits to this issue, and appellee contends that the question was waived under California law because it was improperly pleaded at trial. Nor is it totally clear from the record before us what collateral effect the pretrial dismissal might have under state law. The dismissal was based, at least in part, on a failure of the prosecution to present affirmative evidence required by state law, evidence which was apparently presented in this case. Appellant's contention, therefore, is best left to the California courts for further consideration on remand. The issue is not, in any event, a proper subject for appeal. See *Mishkin* v. *New York*, 383 U. S. 502, 512–514 (1966).

political and social changes desired by the people," *Roth* v. *United States, supra,* at 484 (emphasis added). See *Kois* v. *Wisconsin,* 408 U. S., at 230–232; *Thornhill* v. *Alabama,* 310 U. S., at 101–102. But the public portrayal of hard-core sexual conduct for its own sake, and for the ensuing commercial gain, is a different matter.[15]

There is no evidence, empirical or historical, that the stern 19th century American censorship of public distribution and display of material relating to sex, see *Roth* v. *United States, supra,* at 482–485, in any way limited or affected expression of serious literary, artistic, political, or scientific ideas. On the contrary, it is beyond any question that the era following Thomas Jefferson to Theodore Roosevelt was an "extraordinarily vigorous period," not just in economics and politics, but in *belles lettres* and in "the outlying fields of social and political philosophies."[16] We do not see the harsh hand

---

[15] In the apt words of Mr. Chief Justice Warren, appellant in this case was "plainly engaged in the commercial exploitation of the morbid and shameful craving for materials with prurient effect. I believe that the State and Federal Governments can constitutionally punish such conduct. That is all that these cases present to us, and that is all we need to decide." *Roth* v. *United States, supra,* at 496 (concurring opinion).

[16] See 2 V. Parrington, Main Currents in American Thought *ix et seq.* (1930). As to the latter part of the 19th century, Parrington observed "A new age had come and other dreams—the age and the dreams of a middle-class sovereignty . . . . From the crude and vast romanticisms of that vigorous sovereignty emerged eventually a spirit of realistic criticism, seeking to evaluate the worth of this new America, and discover if possible other philosophies to take the place of those which had gone down in the fierce battles of the Civil War." *Id.,* at 474. Cf. 2 S. Morison, H. Commager & W. Leuchtenburg, The Growth of the American Republic 197–233 (6th ed. 1969); Paths of American Thought 123–166, 203–290 (A. Schlesinger & M. White ed. 1963) (articles of Fleming, Lerner, Morton & Lucia White, E. Rostow, Samuelson, Kazin, Hofstadter); and H. Wish, Society and Thought in Modern America 337–386 (1952).

of censorship of ideas—good or bad, sound or unsound—and "repression" of political liberty lurking in every state regulation of commercial exploitation of human interest in sex.

MR. JUSTICE BRENNAN finds "it is hard to see how state-ordered regimentation of our minds can ever be forestalled." *Paris Adult Theatre I* v. *Slaton, post,* at 110 (BRENNAN, J., dissenting). These doleful anticipations assume that courts cannot distinguish commerce in ideas, protected by the First Amendment, from commercial exploitation of obscene material. Moreover, state regulation of hard-core pornography so as to make it unavailable to nonadults, a regulation which MR. JUSTICE BRENNAN finds constitutionally permissible, has all the elements of "censorship" for adults; indeed even more rigid enforcement techniques may be called for with such dichotomy of regulation. See *Interstate Circuit, Inc.* v. *Dallas,* 390 U. S., at 690.[17] One can concede that the "sexual revolution" of recent years may have had useful byproducts in striking layers of prudery from a subject long irrationally kept from needed ventilation. But it does not follow that no regulation of patently offensive "hard core" materials is needed or permissible; civilized people do not allow unregulated access to heroin because it is a derivative of medicinal morphine.

In sum, we (a) reaffirm the *Roth* holding that obscene material is not protected by the First Amendment; (b) hold that such material can be regulated by the States, subject to the specific safeguards enunciated

---

[17] "[W]e have indicated . . . that because of its strong and abiding interest in youth, a State may regulate the dissemination to juveniles of, and their access to, material objectionable as to them, but which a State clearly could not regulate as to adults. *Ginsberg* v. *New York,* . . . [390 U. S. 629 (1968)]." *Interstate Circuit, Inc.* v. *Dallas,* 390 U. S. 676, 690 (1968) (footnote omitted).

above, without a showing that the material is *"utterly without redeeming social value"*; and (c) hold that obscenity is to be determined by applying "contemporary community standards," see *Kois* v. *Wisconsin, supra,* at 230, and *Roth* v. *United States, supra,* at 489, not "national standards." The judgment of the Appellate Department of the Superior Court, Orange County, California, is vacated and the case remanded to that court for further proceedings not inconsistent with the First Amendment standards established by this opinion. See *United States* v. *12 200-ft. Reels of Film, post,* at 130 n. 7.

*Vacated and remanded.*

MR. JUSTICE DOUGLAS, dissenting.

I

Today we leave open the way for California [1] to send a man to prison for distributing brochures that advertise books and a movie under freshly written standards defining obscenity which until today's decision were never the part of any law.

The Court has worked hard to define obscenity and concededly has failed. In *Roth* v. *United States,* 354 U. S. 476, it ruled that "[o]bscene material is material which deals with sex in a manner appealing to prurient interest." *Id.,* at 487. Obscenity, it was said, was rejected by the First Amendment because it is "utterly without redeem-

---

[1] California defines "obscene matter" as "matter, taken as a whole, the predominant appeal of which to the average person, applying contemporary standards, is to prurient interest, i. e., a shameful or morbid interest in nudity, sex, or excretion; and is matter which taken as a whole goes substantially beyond customary limits of candor in description or representation of such matters; and is matter which taken as a whole is utterly without redeeming social importance." Calif. Penal Code § 311 (a).

ing social importance." *Id.,* at 484. The presence of a "prurient interest" was to be determined by "contemporary community standards." *Id.,* at 489. That test, it has been said, could not be determined by one standard here and another standard there, *Jacobellis* v. *Ohio,* 378 U. S. 184, 194, but "on the basis of a national standard." *Id.,* at 195. My Brother STEWART in *Jacobellis* commented that the difficulty of the Court in giving content to obscenity was that it was "faced with the task of trying to define what may be indefinable." *Id.,* at 197.

In *Memoirs* v. *Massachusetts,* 383 U. S. 413, 418, the *Roth* test was elaborated to read as follows: "[T]hree elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value."

In *Ginzburg* v. *United States,* 383 U. S. 463, a publisher was sent to prison, not for the kind of books and periodicals he sold, but for the manner in which the publications were advertised. The "leer of the sensualist" was said to permeate the advertisements. *Id.,* at 468. The Court said, "Where the purveyor's sole emphasis is on the sexually provocative aspects of his publications, that fact may be decisive in the determination of obscenity." *Id.,* at 470. As Mr. Justice Black said in dissent, ". . . Ginzburg . . . is now finally and authoritatively condemned to serve five years in prison for distributing printed matter about sex which neither Ginzburg nor anyone else could possibly have known to be criminal." *Id.,* at 476. That observation by Mr. Justice Black is underlined by the fact that the *Ginzburg* decision was five to four.

A further refinement was added by *Ginsberg* v. *New York,* 390 U. S. 629, 641, where the Court held that "it was not irrational for the legislature to find that exposure to material condemned by the statute is harmful to minors."

But even those members of this Court who had created the new and changing standards of "obscenity" could not agree on their application. And so we adopted a *per curiam* treatment of so-called obscene publications that seemed to pass constitutional muster under the several constitutional tests which had been formulated. See *Redrup* v. *New York,* 386 U. S. 767. Some condemn it if its "dominant tendency might be to 'deprave or corrupt' a reader." [2] Others look not to the content of the book but to whether it is advertised " 'to appeal to the erotic interests of customers.' " [3] Some condemn only "hardcore pornography"; but even then a true definition is lacking. It has indeed been said of that definition, "I could never succeed in [defining it] intelligibly," but "I know it when I see it." [4]

Today we would add a new three-pronged test: "(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, . . . (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value."

Those are the standards we ourselves have written into the Constitution. [5] Yet how under these vague tests can

---

[2] *Roth* v. *United States,* 354 U. S. 476, 502 (opinion of Harlan, J.).

[3] *Ginzburg* v. *United States,* 383 U. S. 463, 467.

[4] *Jacobellis* v. *Ohio,* 378 U. S. 184, 197 (STEWART, J., concurring).

[5] At the conclusion of a two-year study, the U. S. Commission on

we sustain convictions for the sale of an article prior to the time when some court has declared it to be obscene?

Today the Court retreats from the earlier formulations of the constitutional test and undertakes to make new definitions. This effort, like the earlier ones, is earnest and well intentioned. The difficulty is that we do not deal with constitutional terms, since "obscenity" is not mentioned in the Constitution or Bill of Rights. And the First Amendment makes no such exception from "the press" which it undertakes to protect nor, as I have said on other occasions, is an exception necessarily implied, for there was no recognized exception to the free press at the time the Bill of Rights was adopted which treated "obscene" publications differently from other types of papers, magazines, and books. So there are no constitutional guidelines for deciding what is and what is not "obscene." The Court is at large because we deal with tastes and standards of literature. What shocks me may

---

Obscenity and Pornography determined that the standards we have written interfere with constitutionally protected materials:

"Society's attempts to legislate for adults in the area of obscenity have not been successful. Present laws prohibiting the consensual sale or distribution of explicit sexual materials to adults are extremely unsatisfactory in their practical application. The Constitution permits material to be deemed 'obscene' for adults only if, as a whole, it appeals to the 'prurient' interest of the average person, is 'patently offensive' in light of 'community standards,' and lacks 'redeeming social value.' These vague and highly subjective aesthetic, psychological and moral tests do not provide meaningful guidance for law enforcement officials, juries or courts. As a result, law is inconsistently and sometimes erroneously applied and the distinctions made by courts between prohibited and permissible materials often appear indefensible. Errors in the application of the law and uncertainty about its scope also cause interference with the communication of constitutionally protected materials." Report of the Commission on Obscenity and Pornography 53 (1970).

be sustenance for my neighbor. What causes one person to boil up in rage over one pamphlet or movie may reflect only his neurosis, not shared by others. We deal here with a regime of censorship which, if adopted, should be done by constitutional amendment after full debate by the people.

Obscenity cases usually generate tremendous emotional outbursts. They have no business being in the courts. If a constitutional amendment authorized censorship, the censor would probably be an administrative agency. Then criminal prosecutions could follow as, if, and when publishers defied the censor and sold their literature. Under that regime a publisher would know when he was on dangerous ground. Under the present regime— whether the old standards or the new ones are used—the criminal law becomes a trap. A brand new test would put a publisher behind bars under a new law improvised by the courts after the publication. That was done in *Ginzburg* and has all the evils of an *ex post facto* law.

My contention is that until a civil proceeding has placed a tract beyond the pale, no criminal prosecution should be sustained. For no more vivid illustration of vague and uncertain laws could be designed than those we have fashioned. As Mr. Justice Harlan has said:

> "The upshot of all this divergence in viewpoint is that anyone who undertakes to examine the Court's decisions since *Roth* which have held particular material obscene or not obscene would find himself in utter bewilderment." *Interstate Circuit, Inc.* v. *Dallas,* 390 U. S. 676, 707.

In *Bouie* v. *City of Columbia,* 378 U. S. 347, we upset a conviction for remaining on property after being asked to leave, while the only unlawful act charged by the statute was entering. We held that the defendants had received no "fair warning, at the time of their con-

duct" while on the property "that the act for which they now stand convicted was rendered criminal" by the state statute. *Id.*, at 355. The same requirement of "fair warning" is due here, as much as in *Bouie*. The latter involved racial discrimination; the present case involves rights earnestly urged as being protected by the First Amendment. In any case—certainly when constitutional rights are concerned—we should not allow men to go to prison or be fined when they had no "fair warning" that what they did was criminal conduct.

## II

If a specific book, play, paper, or motion picture has in a civil proceeding been condemned as obscene and review of that finding has been completed, and thereafter a person publishes, shows, or displays that particular book or film, then a vague law has been made specific. There would remain the underlying question whether the First Amendment allows an implied exception in the case of obscenity. I do not think it does [6] and my views

---

[6] It is said that "obscene" publications can be banned on authority of restraints on communications incident to decrees restraining unlawful business monopolies or unlawful restraints of trade, *Sugar Institute* v. *United States*, 297 U. S. 553, 597, or communications respecting the sale of spurious or fraudulent securities. *Hall* v. *Geiger-Jones Co.*, 242 U. S. 539, 549; *Caldwell* v. *Sioux Falls Stock Yards Co.*, 242 U. S. 559, 567; *Merrick* v. *Halsey & Co.*, 242 U. S. 568, 584. The First Amendment answer is that whenever speech and conduct are brigaded—as they are when one shouts "Fire" in a crowded theater—speech can be outlawed. Mr. Justice Black, writing for a unanimous Court in *Giboney* v. *Empire Storage Co.*, 336 U. S. 490, stated that labor unions could be restrained from picketing a firm in support of a secondary boycott which a State had validly outlawed. Mr. Justice Black said: "It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute. We reject the contention now." *Id.*, at 498.

on the issue have been stated over and over again.[7]   But at least a criminal prosecution brought at that juncture would not violate the time-honored void-for-vagueness test.[8]

No such protective procedure has been designed by California in this case.   Obscenity—which even we cannot define with precision—is a hodge-podge.   To send

---

[7] See *United States* v. *12 200-ft. Reels of Film, post,* p. 123; *United States* v. *Orito, post,* p. 139; *Kois* v. *Wisconsin,* 408 U. S. 229; *Byrne* v. *Karalexis,* 396 U. S. 976, 977; *Ginsberg* v. *New York,* 390 U. S. 629, 650; *Jacobs* v. *New York,* 388 U. S. 431, 436; *Ginzburg* v. *United States,* 383 U. S. 463, 482; *Memoirs* v. *Massachusetts,* 383 U. S. 413, 424; *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 72; *Times Film Corp.* v. *Chicago,* 365 U. S. 43, 78; *Smith* v. *California,* 361 U. S. 147, 167; *Kingsley Pictures Corp.* v. *Regents,* 360 U. S. 684, 697; *Roth* v. *United States,* 354 U. S. 476, 508; *Kingsley Books, Inc.* v. *Brown,* 354 U. S. 436, 446; *Superior Films, Inc.* v. *Department of Education,* 346 U. S. 587, 588; *Gelling* v. *Texas,* 343 U. S. 960.

[8] The Commission on Obscenity and Pornography has advocated such a procedure:

*"The Commission recommends the enactment, in all jurisdictions which enact or retain provisions prohibiting the dissemination of sexual materials to adults or young persons, of legislation authorizing prosecutors to obtain declaratory judgments as to whether particular materials fall within existing legal prohibitions . . . .*

"A declaratory judgment procedure . . . would permit prosecutors to proceed civilly, rather than through the criminal process, against suspected violations of obscenity prohibition.  If such civil procedures are utilized, penalties would be imposed for violation of the law only with respect to conduct occurring after a civil declaration is obtained.  The Commission believes this course of action to be appropriate whenever there is any existing doubt regarding the legal status of materials; where other alternatives are available, the criminal process should not ordinarily be invoked against persons who might have reasonably believed, in good faith, that the books or films they distributed were entitled to constitutional protection, for the threat of criminal sanctions might otherwise deter the free distribution of constitutionally protected material."  Report of the Commission on Obscenity and Pornography 63 (1970).

men to jail for violating standards they cannot understand, construe, and apply is a monstrous thing to do in a Nation dedicated to fair trials and due process.

### III

While the right to know is the corollary of the right to speak or publish, no one can be forced by government to listen to disclosure that he finds offensive. That was the basis of my dissent in *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451, 467, where I protested against making streetcar passengers a "captive" audience. There is no "captive audience" problem in these obscenity cases. No one is being compelled to look or to listen. Those who enter newsstands or bookstalls may be offended by what they see. But they are not compelled by the State to frequent those places; and it is only state or governmental action against which the First Amendment, applicable to the States by virtue of the Fourteenth, raises a ban.

The idea that the First Amendment permits government to ban publications that are "offensive" to some people puts an ominous gloss on freedom of the press. That test would make it possible to ban any paper or any journal or magazine in some benighted place. The First Amendment was designed "to invite dispute," to induce "a condition of unrest," to "create dissatisfaction with conditions as they are," and even to stir "people to anger." *Terminiello* v. *Chicago,* 337 U. S. 1, 4. The idea that the First Amendment permits punishment for ideas that are "offensive" to the particular judge or jury sitting in judgment is astounding. No greater leveler of speech or literature has ever been designed. To give the power to the censor, as we do today, is to make a sharp and radical break with the traditions of a free society. The First Amendment was not fashioned as a vehicle for

dispensing tranquilizers to the people. Its prime function was to keep debate open to "offensive" as well as to "staid" people. The tendency throughout history has been to subdue the individual and to exalt the power of government. The use of the standard "offensive" gives authority to government that cuts the very vitals out of the First Amendment.[9] As is intimated by the Court's opinion, the materials before us may be garbage. But so is much of what is said in political campaigns, in the daily press, on TV, or over the radio. By reason of the First Amendment—and solely because of it—speakers and publishers have not been threatened or subdued because their thoughts and ideas may be "offensive" to some.

The standard "offensive" is unconstitutional in yet another way. In *Coates* v. *City of Cincinnati,* 402 U. S. 611, we had before us a municipal ordinance that made it a crime for three or more persons to assemble on a street and conduct themselves "in a manner annoying to persons

---

[9] Obscenity law has had a capricious history:

"The white slave traffic was first exposed by W. T. Stead in a magazine article, 'The Maiden Tribute.' The English law did absolutely nothing to the profiteers in vice, but put Stead in prison for a year for writing about an indecent subject. When the law supplies no definite standard of criminality, a judge in deciding what is indecent or profane may consciously disregard the sound test of present injury, and proceeding upon an entirely different theory may condemn the defendant because his words express ideas which are thought liable to cause bad future consequences. Thus musical comedies enjoy almost unbridled license, while a problem play is often forbidden because opposed to our views of marriage. In the same way, the law of blasphemy has been used against Shelley's *Queen Mab* and the decorous promulgation of pantheistic ideas, on the ground that to attack religion is to loosen the bonds of society and endanger the state. This is simply a roundabout modern mëthod to make heterodoxy in sex matters and even in religion a crime." Z. Chafee, Free Speech in the United States 151 (1942).

passing by." We struck it down, saying: "If three or more people meet together on a sidewalk or street corner, they must conduct themselves so as not to annoy any police officer or other person who should happen to pass by. In our opinion this ordinance is unconstitutionally vague because it subjects the exercise of the right of assembly to an unascertainable standard, and unconstitutionally broad because it authorizes the punishment of constitutionally protected conduct.

"Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensive normative standard, but rather in the sense that no standard of conduct is specified at all." *Id.*, at 614.

How we can deny Ohio the convenience of punishing people who "annoy" others and allow California power to punish people who publish materials "offensive" to some people is difficult to square with constitutional requirements.

If there are to be restraints on what is obscene, then a constitutional amendment should be the way of achieving the end. There are societies where religion and mathematics are the only free segments. It would be a dark day for America if that were our destiny. But the people can make it such if they choose to write obscenity into the Constitution and define it.

We deal with highly emotional, not rational, questions. To many the Song of Solomon is obscene. I do not think we, the judges, were ever given the constitutional power to make definitions of obscenity. If it is to be defined, let the people debate and decide by a constitutional amendment what they want to ban as obscene and what standards they want the legislatures and the courts to apply. Perhaps the people will decide that the path towards a mature, integrated society requires

that all ideas competing for acceptance must have no censor. Perhaps they will decide otherwise. Whatever the choice, the courts will have some guidelines. Now we have none except our own predilections.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE STEWART and MR. JUSTICE MARSHALL join, dissenting.

In my dissent in *Paris Adult Theatre I* v. *Slaton, post,* p. 73, decided this date, I noted that I had no occasion to consider the extent of state power to regulate the distribution of sexually oriented material to juveniles or the offensive exposure of such material to unconsenting adults. In the case before us, appellant was convicted of distributing obscene matter in violation of California Penal Code § 311.2, on the basis of evidence that he had caused to be mailed unsolicited brochures advertising various books and a movie. I need not now decide whether a statute might be drawn to impose, within the requirements of the First Amendment, criminal penalties for the precise conduct at issue here. For it is clear that under my dissent in *Paris Adult Theatre I,* the statute under which the prosecution was brought is unconstitutionally overbroad, and therefore invalid on its face.* "[T]he transcendent value to all society of constitutionally protected expression is deemed to justify allowing 'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.' " *Gooding* v. *Wilson,* 405 U. S. 518, 521 (1972), quoting

---

*Cal. Penal Code § 311.2 (a) provides that "Every person who knowingly: sends or causes to be sent, or brings or causes to be brought, into this state for sale or distribution, or in this state prepares, publishes, prints, exhibits, distributes, or offers to distribute, or has in his possession with intent to distribute or to exhibit or offer to distribute, any obscene matter is guilty of a misdemeanor."

from *Dombrowski* v. *Pfister,* 380 U. S. 479, 486 (1965).
See also *Baggett* v. *Bullitt,* 377 U. S. 360, 366 (1964);
*Coates* v. *City of Cincinnati,* 402 U. S. 611, 616 (1971);
*id.,* at 619–620 (WHITE, J., dissenting); *United States* v.
*Raines,* 362 U. S. 17, 21–22 (1960); *NAACP* v. *Button,*
371 U. S. 415, 433 (1963). Since my view in *Paris Adult
Theatre I* represents a substantial departure from the
course of our prior decisions, and since the state courts
have as yet had no opportunity to consider whether a
"readily apparent construction suggests itself as a vehicle
for rehabilitating the [statute] in a single prosecution,"
*Dombrowski* v. *Pfister, supra,* at 491, I would reverse the
judgment of the Appellate Department of the Superior
Court and remand the case for proceedings not incon-
sistent with this opinion. See *Coates* v. *City of Cincin-
nati, supra,* at 616.