**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

JEFFREY A. KILBRIDE,
  *Defendant-Appellant.*

No. 07-10528

D.C. No.
CR-05-00870-
DGC-2

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

JAMES ROBERT SCHAFFER,
  *Defendant-Appellant.*

No. 07-10534

D.C. No.
CR-05-00870-
DGC-3

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted
June 8, 2009—San Francisco, California

Filed October 28, 2009

Before: Procter Hug, Jr., Betty B. Fletcher and
Michael Daly Hawkins, Circuit Judges.

Opinion by Judge B. Fletcher

14469

**COUNSEL**

Gary Jay Kaufman (argued), Dana Milmeister, and Colin Hardacre, The Kaufman Law Group, and Gregory A. Piccionelli (argued) and Robert Sarno, Piccionelli & Sarno, Los Angeles, California, for the defendants-appellants.

Jill Trumbull-Harris (argued), Assistant United States Attorney, United States Attorney's Office for the Northern District of Indiana, Hammond, Indiana, and Bonnie L. Kane, Trial Attorney, Criminal Division, United States Department of Justice, Washington, DC, for the plaintiff-appellee.

**OPINION**

B. FLETCHER, Circuit Judge:

Defendants-Appellants Jeffrey Kilbride and James Schaffer ("Defendants") appeal their convictions and sentences for fraud and conspiracy to commit fraud in connection with electronic mail, interstate transportation and interstate transportation for sale of obscene materials, and conspiracy to commit

money laundering. We affirm, but remand for a clerical correction.

Defendants' convictions arose from conduct relating to their business of sending unsolicited bulk email, popularly known as "spam," advertising adult websites. *See United States v. Kelley*, 482 F.3d 1047, 1055 & n.2 (9th Cir. 2007) (Thomas, J., dissenting) (discussing origins of "spam" label). Defendants argue that 1) the district court committed reversible error in its jury instructions defining obscenity; 2) 18 U.S.C. § 1037, which criminalizes fraud in connection with electronic mail, is unconstitutionally vague as applied to Defendants and on its face; 3) the district court committed a clerical error in its written judgment by labeling as felonies Defendants' convictions for fraud in connection with electronic mail; 4) Defendants' money laundering conspiracy convictions should be reversed because the required related activity charged in the Indictment was not shown beyond a reasonable doubt to be unlawful as defined in 18 U.S.C. § 1462; and 5) the district court erred in applying an obstruction of justice enhancement to Kilbride's sentence. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## I.   Background

### A.   *Defendants' Bulk Email Advertising Business*

Defendants began their bulk email advertising business in 2003. They initially operated the business through an American corporation, using servers in Arizona. In response to new legislation regulating email communication, the Defendants shifted the operation of their business overseas, running it through Ganymede Marketing ("Ganymede"), a Mauritian company, and using servers located in the Netherlands. Although Defendants used a business structure preventing a direct link to Ganymede, Defendants were its true owners and operators. If a recipient of Defendants' emails signed on to the advertised website and paid a fee, Defendants earned a

commission from the entity promoted. The advertisements appearing in Defendants' emails included sexually explicit images, two of which formed the basis for the obscenity convictions.

Defendants had their employees place fictitious information in the headers[1] of their bulk emails. Defendants' employee Jennifer Clason created nonsensical domain names and matched them with generic user names to generate a series of different email addresses that were almost certainly nonfunctional. These were placed in the "From" field of the headers of each email sent out.[2] Another employee of Defendants, Kirk Rogers, designed a program utilized by Defendants that generated non-functioning email addresses in the "From" field by combining the domain name used to send each email with the recipient of the email's user name. In addition, the email address appearing in the "From" field and "Return-Path" field of the headers of Defendants' emails differed, indicating at least one was false.

Defendants also falsified information appearing in the registration of the domain names they used. The registrant for each of the emails was listed as Ganymede Marketing. The correct physical address for Ganymede was listed, but the contact person and phone number listed were false. The email listed in the registration was never tested for functionality, though the evidence indicates that at some point it became invalid. A reverse look-up of the internet provider address appearing in the email headers came back to a different entity, Kobalt Networks, registered in the Netherlands.

---

[1]A "header" is called "header information" in the relevant statute and defined as "the source, destination, and routing information attached to an electronic mail message, including the originating domain name and originating electronic mail address, and any other information that appears in the line identifying, or purporting to identify, a person initiating the message." 15 U.S.C. § 7702(8).

[2]In an email address, the user name is the portion appearing before the @ symbol, while the domain name is the portion appearing after the @.

### B.   Indictment and Trial

On August 25, 2005, Defendants were indicted for conspiracy to violate 18 U.S.C. § 1037(a)(3) through fraud in connection with electronic mail (Count 1), violation of § 1037(a)(3) and (a)(4) through such fraud (Counts 2 and 3), interstate transportation of obscene materials in violation of 18 U.S.C. § 1462 (Counts 4 and 5), interstate transportation of obscene materials for sale in violation of 18 U.S.C. § 1465 (Counts 6 and 7); conspiracy to commit money laundering in violation of 18 U.S.C. § 1956 (Count 8), and failure to meet record keeping requirements in violation of 18 U.S.C. § 2257 (Count 9). Jennifer Clason was indicted as a co-conspirator. She pled guilty and testified against Defendants.

Defendants were convicted on all counts following a three-week jury trial. The two sexually explicit images forming the basis of the obscenity charges were introduced. Jennifer Clason testified to sending these images on behalf of Defendants using the Defendants' bulk email interface. Evidence was presented at trial as to the obscenity of the two images. The Government called eight witnesses from various parts of the country who had complained to the Federal Trade Commission ("FTC") about Defendants' emails. These witnesses testified to the circumstances under which they received Defendants' emails, their reactions to and attitude towards the images sent by Defendants, and their views on pornography generally. Some of the witnesses did not specifically recall receiving the two images at issue. The Government also presented evidence of over 662,000 complaints received by the FTC from around the country concerning Defendants' emails, including the text of some of the complaints. Defendants called Jay Pirouznia, a private investigator, who testified as to various digital video discs containing images similar to those at issue that he purchased in the Phoenix metropolitan area and other counties in Arizona.

Prior to the reading of the jury instructions at trial, Defendants objected to instructions relating to Counts 1 through 7

on various grounds, some of which are raised in this appeal. Following their convictions, Defendants filed a motion for judgment of acquittal or a new trial raising grounds not at issue in this appeal. The motion was denied, but a separate motion to dismiss Count 9 was granted.

### C.   Sentencing

Jeffrey Kilbride ("Kilbride") was sentenced to 78 months and Robert Schaffer ("Schaffer") was sentenced to 63 months. The district court determined that Defendants' convictions under Counts 1, 2, and 3 were misdemeanors under the terms of § 1037 because the jury had not been asked to make the necessary findings under the statute to render Defendants' convictions felonies. However, despite referencing the misdemeanor penalty provisions of § 1037, the written judgments for Defendants designated these convictions as felonies.

Over Kilbride's objection, the district court applied a two-level obstruction of justice enhancement to his sentence. The enhancement was based on Kilbride's attempts to prevent Laval Law, an officer of Ganymede, from testifying. Law traveled to the United States from Mauritius to testify for the Government in Defendants' trial.[3] On June 8, 2007, several days prior to Law's testimony, Defendant Kilbride filed an action in the courts of Mauritius against Law and other entities, alleging the illegal disclosure of Ganymede documents. He obtained a temporary injunction prohibiting Law and the other respondents from testifying concerning the affairs of Ganymede and related entities and beneficiaries. Kilbride filed his action shortly prior to the time for Law's scheduled testimony, despite the fact that the Ganymede documents at issue in the action were obtained by the Government in 2005, and had been disclosed in discovery, and the fact that the

---

[3]The description of the events underlying the application of the obstruction of justice enhancement are drawn from the district court's findings at sentencing, which are uncontested by Defendants.

Government had made arrangements in May 2007 for Law to travel and testify. In addition, in filing the action, Kilbride asserted an interest in Ganymede in contradiction to his attempts at trial to distance himself from Ganymede. Law subsequently declined to testify out of fear that he would be held in contempt in Mauritius. On June 11, 2007, in light of the injunction, the Government filed an emergency motion requesting that the district court enter a protective order determining the scope of Law's testimony. When confronted by the district court at a hearing on the matter, Kilbride's trial counsel agreed to take action that eventually led to the lifting of the injunction as to Law, allowing Law to testify. Rejecting Kilbride's explanations for obtaining the order, the district court found that Kilbride filed the action as an intentional tactical maneuver to prevent Law from testifying and, therefore, merited application of the obstruction of justice enhancement.

## II.   Discussion

### A.   *Challenge to Jury Instructions Defining Obscenity*

**[1]** The Defendants challenge their convictions on Counts 4 through 7 on the ground that the district court erred in instructing the jury as to the definition of obscene expression regulated by 18 U.S.C. §§ 1462 and 1465. Obscene expression is not protected by the First Amendment. *Kois v. Wisconsin*, 408 U.S. 229, 230 (1972). Since the Supreme Court's holding in *Miller v. California*, the test for determining whether a work is subject to regulation as obscenity has the following three prongs:

> (a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable . . . law; and (c) whether the work,

taken as a whole, lacks serious literary, artistic, polit-
ical, or scientific value.

413 U.S. 15, 24 (1973) (internal citations and quotation marks
omitted). Though *Miller* involved application of a state
obscenity statute, the *Miller* test has subsequently been found
to define regulated speech for purposes of federal obscenity
statutes such as §§ 1462 and 1465, as well. *See Hamling v.
United States*, 418 U.S. 87, 106 (1974); *United States v.
Schales*, 546 F.3d 965, 973 (9th Cir. 2008).

**[2]** Defendants' challenge to the adequacy of the jury
instructions' definition of obscenity focuses on the instruc-
tions' explication of the meaning of the term "contemporary
community standards." The application of contemporary com-
munity standards in defining obscenity is intended to ensure
that "so far as material is not aimed at a deviant group, it will
be judged by its impact on an average person, rather than a
particularly susceptible or sensitive person — or indeed a
totally insensitive one." *Miller*, 413 U.S. at 33. The Court, in
line with this view, has held, in a case involving obscenity
disseminated via the regular mails, that for purposes of federal
obscenity statutes no "precise geographical area" need be
applied in defining "contemporary community standards."
*Hamling*, 418 U.S. at 105. As a result, in federal obscenity
prosecutions, a juror may simply "draw on knowledge of the
community or vicinage from which he comes" in determining
contemporary community standards. *Id.*

Defendants raise alternative arguments as to why the dis-
trict court improperly instructed the jury about the meaning of
"contemporary community standards." Defendants first assert
that the district court erred by instructing the jurors to apply
the standards of communities beyond their own community or
of a global community in determining contemporary commu-
nity standards, contravening *Hamling*'s expectation that jurors
would look only to their own local community's standards.
Second, Defendants argue that as the obscenity at issue was

transported via email, the district court erred by failing to hold that existing precedent was inapplicable and instructing the jury to determine contemporary community standards by reference to the national community. Hence, in a sense, Defendants argue the instructions fell between two stools. In the view of Defendants, the instructions neither complied with the localized definition of contemporary community standards mandated by existing precedent, nor complied with the national definition of contemporary community standards that Defendants propose we should now hold is applicable to expression disseminated through email. We review these alternative contentions in sequence.

### 1. Standards of Review

We "review de novo whether a jury instruction misstates an element of a crime, and we review for abuse of discretion a district court's formulation of an instruction." *United States v. Peterson*, 538 F.3d 1064, 1070 (9th Cir. 2008). Any omission or misstatement of an element of an offense in the jury instructions is constitutional error and, therefore, requires reversal unless we find the error "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967); *see Hedgpeth v. Pulido*, 129 S. Ct. 530, 532 (2008). However, " '[i]n the absence of a timely objection to the jury instructions, we review for plain error.' " *Peterson*, 538 F.3d at 1070 (quoting *United States v. Moran*, 493 F.3d 1002, 1009 (9th Cir. 2007) (per curiam)). "Plain error review requires us to find (1) an error that is (2) plain and (3) affects substantial rights. Even if these conditions were met, we may only exercise our discretion to correct the error if it seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 1071-72 (quoting *United States v. Nash*, 115 F.3d 1431, 1437 (9th Cir. 1997)) (internal quotation marks and alterations omitted).

### 2. Adequacy of Jury Instructions

Defendants assert first that the jury instructions failed to comply with the prevailing definition of contemporary com-

munity standards for purposes of federal obscenity prosecutions outlined in *Hamling*. Defendants object specifically to various phrases in the district court's Jury Instruction Number 36 defining obscenity, claiming they impermissibly allowed the jurors to rely on standards outside their own community or on some broad global standard in determining contemporary community standards. First, Defendants object to the instruction's reference to contemporary community standards as involving

> what is in fact accepted in the community as a whole; *that is to say by society at large, or people in general*, and not merely by what the community tolerates nor by what some persons or groups of persons may believe the community as a whole ought to accept or refuse to accept.

(Emphasis added.) Second, Defendants object to the portion of the instruction stating: "The 'community' you should consider in deciding these questions is not defined by a precise geographic area. You may consider evidence of standards existing in places outside of this particular district." Finally, Defendants object to the portion of the instruction stating: "The parties have presented evidence concerning contemporary community standards. You should consider the evidence presented, but you may also consider your own experience and judgment in determining contemporary community standards." Defendants assert this final portion is problematic because the only evidence of community standards presented by the Government related to communities outside the district where the prosecution occurred. Defendants objected to all these portions of the instruction in the district court.

[3] We conclude, applying the prevailing definition of contemporary community standards put forth in *Hamling*, that the challenged portions do not constitute prejudicial error. *See Chapman*, 386 U.S. at 24 (reversal required unless error is harmless beyond reasonable doubt). The portion of the

instruction stating that the relevant community lacks a precise geographic definition follows directly from *Hamling*'s holding that the relevant community is not to be geographically defined in federal obscenity prosecutions, permitting the jury to apply their own sense of what contemporary community standards are, based on their own community. *Hamling*, 418 U.S. 104-05; *see also United States v. Cutting*, 538 F.2d 835, 841 (9th Cir. 1976) (en banc) (stating contemporary community standards "is a general standard, not a geographic one"); *United States v. Dachsteiner,* 518 F.2d 20, 22 (9th Cir. 1975) ("Neither *Miller* nor *Hamling* . . . requires the trial court to define the relevant community in metes and bounds."). No authority supports the Defendants' contrary notion that a district court must provide a clear geographic definition of the relevant community in a federal prosecution. Hence, the geographic definition instruction in of itself was entirely appropriate.

[4] Similarly, the challenged portion of the instruction explicitly and implicitly allowing jurors to consider evidence of standards existing in places outside of the district is clearly permitted under *Hamling*. There, the Court found that, though jurors would most likely draw from the standards of the community they came from in determining contemporary community standards, "this is not to say that a district court would not be at liberty to admit evidence of standards existing in some place outside of this particular district, if it felt such evidence would assist the jurors in the resolution of the issues which they were to decide." 418 U.S. at 106; *cf. United States v. Danley*, 523 F.2d 369, 370 (9th Cir. 1975) ("While . . . it is permissible in federal prosecution to define the state as a community, it is clear from *Hamling* that consideration may be given to standards without the state." (citations omitted)). We read this statement in *Hamling* as recognizing the entirely logical proposition that evidence of standards of communities outside the district may in a court's judgment help jurors gauge what their own sense of contemporary community standards are. Allowing jurors to consider such evidence is

acceptable as long as jurors are properly instructed that they are to apply their own sense of what contemporary community standards are. The challenged instructions did exactly this and, therefore, in no way contravene *Hamling*.

Furthermore, at trial neither the Government nor Defendants argued that the jury should apply anything other than their own sense of what contemporary community standards are. Both parties referenced the evidence of community standards outside the district merely as one piece of evidence to consider in determining contemporary community standards. Hence, even were we to accept Defendants' view that the instructions could be read as permitting application of the standards of some community other than that of the jurors, neither party made any argument urging them to do so.[4]

[5] The instruction's references to "society at large" and "people in general" are also not objectionable. Defendants assert that these references indicated that the relevant contemporary community standard is a global or societal one. However, the two references instead simply form part of a general instruction to apply the standards of the community as a whole and not of specific persons or groups, which is the rationale for defining obscenity by reference to contemporary community standards. *Miller*, 413 U.S. at 33. This may have been made clearer had the instructions said "the community at large," rather than "society at large," but even as written we see no likelihood that the jury would have drawn from the challenged references, read in context, the view that the community standard they must apply is that of all of society or of

---

[4]Defendants also briefly argue that this portion of the instruction was problematic because Defendants had no notice that other communities' standards would be considered and, therefore, did not present any evidence of such standards. This argument lacks any foundation. The instructions applied by the district court were proposed prior to trial, the Government presented out-of-district evidence of community standards during the trial, and the instructions merely reflect the clear directive of *Hamling*.

the world. *See Hamling*, 418 U.S. at 107-08 ("[J]ury instructions are to be judged as a whole, rather than by picking isolated phrases from them."); *Dachsteiner*, 518 F.2d at 21 ("We have frequently held that jury instructions are to be judged as a whole, rather than by picking isolated phrases from them.")[5]

Even assuming the challenged references erroneously allowed the jury to apply a global community standard, we conclude Defendants were not prejudiced. The Government at no point presented evidence to the jury purporting to illustrate a global or societal community standard and at no point argued to the jury for application of such a standard. The only reference to a global or communal community standard was in fact made by Defendants, necessarily implying that such a standard would be more tolerant of sexually explicit material than a local standard. Absent any argument or evidence presented to the jury illustrating a global or societal community standard less tolerant than that of the jurors' own sense of contemporary community standards, instruction to the jury allowing application of a global standard or societal standard is harmless. *Cf. Cutting*, 538 F.2d at 841 ("[W]hen an instruction has been given in terms of a 'national' standard, the essence of the question of prejudice is whether the instruction may have led the jury to apply some specialized test that might differ to the defendant's disadvantage from a generalized 'average person, applying contemporary community

[5]Defendants also note that the instructions given varied from the instructions given in an obscenity case in the same courthouse, which Defendants request the court to take judicial notice of. By separate order, we deny the motion. Any variance in the instructions is irrelevant. There is no requirement that instructions for the same offense be formulated in the exact same manner in different prosecutions. *See United States v. Hicks*, 217 F.3d 1038, 1045 (9th Cir. 2000) (" 'The trial court has substantial latitude so long as its instructions fairly and adequately cover the issues presented.' " (quoting *United States v. Frega*, 179 F.3d 793, 806 n.16 (9th Cir. 1999))). As long as the instructions given in Defendants' trial accurately reflected the law and covered the relevant issues, they were not erroneous.

standards' test."); *Dachsteiner*, 518 F.2d at 22 (finding no probability of prejudice from instructions referencing national community standard because "[t]he record contains no evidence that would have tended to persuade the jury that national standards of obscenity are more strict than those in the Northern District of California").[6]

[6] Hence, we conclude the district court's instruction on the meaning of contemporary community standards was not prejudicial error according to the prevailing definition of obscenity in federal prosecutions. We now turn to Defendants' alternative claim that the district court erred in not finding the prevailing definition of obscenity inapplicable to works disseminated via email communication.

### 3.   *Necessity of National Community Standard*

Defendants assert in the alternative that *Hamling*'s prevailing definition of contemporary community standards is not appropriate for speech disseminated via email. Because persons utilizing email to distribute possibly obscene works cannot control which geographic community their works will enter, Defendants argue that applying *Hamling*'s definition of contemporary community standards to works distributed via email unavoidably subjects such works to the standards of the least tolerant community in the country. This, Defendants assert, unacceptably burdens First Amendment protected speech. To avoid this constitutional problem, Defendants argue, obscenity disseminated via email must be defined according to a national community standard. Defendants, however, did not raise this argument in the district court. Accordingly, we review the district court's failure to instruct the jury to apply a national community standard for plain error. *Peterson*, 538 F.3d at 1070. We agree with Defendants

---

[6]While the posture of *Dachsteiner* and *Cutting* required us to apply a less stringent prejudice inquiry than we do here, our observations on the nature of prejudice in those cases are entirely applicable.

that the district court should have instructed the jury to apply a national community standard, but we do not conclude that the district court's failure to do so was plain error.

Defendants' argument is not an entirely novel one. In *Sable Communications of California, Inc. v. FCC*, 492 U.S. 115 (1989), the Court rejected in part a facial challenge to a federal statute criminalizing the interstate transmission of obscene commercial telephone recordings. The appellant there offered sexually oriented telephone recordings nationally through the Pacific Bell telephone network. *Id.* at 117-18. The appellant argued in part that the federal obscenity legislation under which it was prosecuted "place[d] message senders in a 'double bind' by compelling them to tailor all their messages to the least tolerant community." *Id.* at 124. The Court, relying on its previous holding in *Hamling*, reaffirmed that the relevant contemporary community standards for defining obscenity under federal laws were not that of the national community and that the burden thereby placed on distributors of complying with varying local standards did not violate the First Amendment. *Id.* at 124-26. However, in so ruling, the Court noted that the appellant was "free to tailor its messages, on a selective basis, if it so chooses, to the communities it chooses to serve" and that if the appellant's "audience is comprised of different communities with different local standards, [the appellant] ultimately bears the burden of complying with the prohibition on obscene messages." *Id.* at 125-26.

Defendants assert that speech disseminated via email is distinguishable from the speech disseminated via regular mails or telephone at issue in *Hamling* and *Sable* because there is no means to control where geographically their messages will be received. Hence, they cannot tailor their message to the specific communities into which they disseminate their speech and truly must comply with the standards of the least tolerant community in a manner the defendants in *Hamling* and *Sable* did not.

The Supreme Court has analogously recognized that the application of localized community standards to define regulated indecent and obscene Internet speech may generate constitutional concerns for exactly this reason. In *Reno v. ACLU*, 521 U.S. 844 (1997), the Supreme Court declared certain provisions of the Communications Decency Act ("CDA") facially overbroad in violation of the First Amendment. The CDA provisions at issue in *Reno* sought to regulate obscene or indecent expression on the Internet relying on contemporary community standards to define regulated speech. *Id.* at 858-60. The Court listed as one among several issues of facial overbreadth in the CDA that "the 'community standards' criterion as applied to the Internet means that any communication available to a nation wide audience will be judged by the standards of the community most likely to be offended by the message." *Id.* at 877-78.[7] *Reno* did not address, however, Defendants' argument that the application of local community standards to regulate Internet obscenity by itself renders a statute fatally overbroad.

The Supreme Court's fractured decision in *Ashcroft v. ACLU*, 535 U.S. 564 (2002), most directly addresses Defendants' argument. In *Ashcroft*, the Court reviewed the constitutionality of the Child Online Privacy Act, the narrower successor law to the Communications Decency Act, which

---

[7]The Government asserts that communication via email is not analogous to other Internet communication in that email allows the distributor control over who receives a communication. The Government points to the district court's specific finding that "Defendants did not post images on the Internet for world-wide consumption; Defendants were not incapable of limiting the distribution of their messages; Defendants purposefully sent images to individual homes and had full control over where and by whom the images were received." The district court's finding is beside the point. The district court made no finding that the email technology utilized by Defendants provided them with an ability to control *physically* where the emails they disseminated were read. Hence, for purposes of the First Amendment concerns raised by Defendants, Defendants' email communications are analogous to other Internet communication.

sought to regulate material "harmful to minors" transmitted via the World Wide Web "for commercial purposes." *Id.* at 569. The Third Circuit concluded that COPA was facially overbroad on the narrow ground that it identified material "harmful to minors," utilizing a test that relied on contemporary community standards. *ACLU v. Reno*, 217 F.3d 162, 173-74 (3d Cir. 2000). The Third Circuit found that COPA's use of contemporary community standards was constitutionally problematic because "Web publishers are without any means to limit access to their sites based on the geographic location of particular Internet users." *Id.* at 175. The Supreme Court vacated the Third Circuit judgment, holding that "COPA's reliance on community standards . . . does not *by itself* render the statute substantially overbroad for purposes of the First Amendment." *Ashcroft*, 535 U.S. at 585 (emphasis in original); *see id.* at 597 (Kennedy, J., concurring in the judgment). However, the eight Justices concurring in the judgment applied divergent reasoning to justify the Court's holding.

Justice Thomas, joined by two other justices, recognized that, regardless of whether a national or local community standard was used for defining material harmful to minors under COPA, "the variance in community standards across the country could still cause juries in different locations to reach inconsistent conclusions as to whether a particular work is 'harmful to minors.' " *Id.* at 577. Justice Thomas, nonetheless, did not find this variance in community standards constitutionally problematic because COPA was, unlike the CDA, narrow in application. *Id.* at 578-84. As a result, Justice Thomas found controlling the rulings of *Hamling* and *Sable* condoning variance in local community standards. *Id.* Justice Thomas did not view as constitutionally significant that distributors of potentially obscene material via the Internet could not control where the material was read. *Id.* at 583. Justice Thomas explained: "If a publisher wishes for its material to be judged only by the standards of particular communities, then it need only take the simple step of utilizing a medium that enables it to target the release of its material into those

communities." *Id.* Were Justice Thomas's opinion the opinion of the Court, we would likely be compelled to reject the Defendants' position. Justice Thomas's opinion both denies the utility of and need for applying a national community standard in defining Internet obscenity.

But Justice Thomas's blanket dismissal of the overbreadth problem identified by the Third Circuit was not joined by a majority of the Court. The remaining two Justices forming the majority were much less sanguine about the application of local community standards in defining Internet obscenity. Justice O'Connor, writing for herself, agreed with Justice Thomas that the respondents had failed to demonstrate on the record before the Court that any variance in local community standards supported a finding that COPA was facially overbroad. *Id.* at 586. However, Justice O'Connor believed that "respondents' failure to prove substantial overbreadth on a facial challenge in this case still leaves open the possibility that the use of local community standards will cause problems for regulation of obscenity on the Internet, for adults as well as children, in future cases." *Id.* at 587. In Justice O'Connor's view, "given Internet speakers' inability to control the geographic location of their audience, expecting them to bear the burden of controlling the recipients of their speech, as we did in *Hamling* and *Sable*, may be entirely too much to ask, and would potentially suppress an inordinate amount of expression." *Id*. Justice O'Connor concluded that, by contrast, "the lesser degree of variation that would result" from application of a national community standard "does not necessarily pose a First Amendment problem." *Id.* at 589. As a result, Justice O'Connor viewed the "adoption of a national standard [as] necessary . . . for any reasonable regulation of Internet obscenity.*" Id.* at 587.

Justice Breyer, also writing for himself, agreed with Justice O'Connor that

> [t]o read the statute as adopting the community standards of every locality in the United States would

> provide the most puritan of communities with a heckler's Internet veto affecting the rest of the Nation. The technical difficulties associated with efforts to confine Internet material to particular geographic areas make the problem particularly serious.

*Id.* at 590. In order to avoid the serious constitutional issues raised by applying local community standards, Justice Breyer interpreted COPA as applying a national community standard. *Id.* at 591. Justice O'Connor's and Justice Breyer's opinions both support Defendants' view that application of local standards in defining Internet obscenity raises a serious constitutional concern that can be alleviated through application of a national community standard.

The remaining justices in the majority joined Justice Kennedy's opinion. Justice Kennedy agreed with Justices O'Connor and Breyer that "[t]he national variation in community standards constitutes a particular burden on Internet speech." *Id.* at 597. However, Justice Kennedy declared that "[w]e cannot know whether variation in community standards renders the Act substantially overbroad without first assessing the extent of the speech covered and the variations in community standards with respect to that speech," which the Third Circuit had failed to do. *Id.* at 597. Justice Kennedy's opinion also disagreed with Justices Breyer and O'Connor that application of a national community standard would eliminate any potential First Amendment issue because "the actual standard applied is bound to vary by community nevertheless." *Id.* at 596.

The lone dissenter, Justice Stevens would have held that the use of varying local community standards to define speech regulated by COPA rendered the law unconstitutionally overbroad for the reasons outlined by Justices O'Connor and Breyer regardless of how it was construed. *Id.* at 602-12. Justice Stevens noted that reliance on a national community standard, even if it could be read into COPA, would not obviate

any unconstitutional variances as "jurors instructed to apply a national, or adult, standard will reach widely different conclusions throughout the country." *Id.* at 607 n.3.

[7] The divergent reasoning of the justices in and out of the majority in *Ashcroft* leaves us with no explicit holding as to the appropriate geographic definition of contemporary community standards to be applied here. Nonetheless, we are able to derive guidance from the areas of agreement in the various opinions. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.' " *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). We have previously applied this rule to "construe[ ] one Justice's concurring opinion as representing a logical subset of the plurality's." *United States v. Williams*, 435 F.3d 1148, 1157 n.9 (9th Cir. 2006). Here, Justice Thomas's opinion held broadly that application of either a national community standard or local community standards to regulate Internet speech would pose no constitutional concerns by itself. None of the remaining justices, however, joined that broad holding. Justices O'Connor and Breyer held more narrowly that while application of a national community standard would not or may not create constitutional concern, application of local community standards likely would. Justice O'Connor's and Justice Breyer's opinions, therefore, agreed with a limited aspect of Justice Thomas's holding: that the variance inherent in application of a national community standard would likely not pose constitutional concerns by itself. They did not join his broader conclusion, however, that application of local community standards is similarly unproblematic. In this latter disagreement, Justices O'Connor and Breyer were joined by Justice Kennedy's opinion, as well as Justice Stevens's dissent. Accordingly, five Justices concurring in the judgment, as well as the dissenting Justice, viewed the application of local

community standards in defining obscenity on the Internet as generating serious constitutional concerns. At the same time, five justices concurring in the judgment viewed the application of a national community standard as not or likely not posing the same concerns by itself. Accordingly, following *Marks*, we must view the distinction Justices O'Connor and Breyer made between the constitutional concerns generated by application of a national and local community standards as controlling.

**[8]** Accepting this distinction, in turn, persuades us to join Justices O'Connor and Breyer in holding that a national community standard must be applied in regulating obscene speech on the Internet, including obscenity disseminated via email. " 'A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score.' " *Almendarez-Torres v. United States*, 523 U.S. 224, 237-238 (1998) (quoting *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916)). The constitutional problems identified by the five justices with applying local community standards to regulate Internet obscenity certainly generate grave constitutional doubts as to the use of such standards in applying §§ 1462 and 1465 to Defendants' activities. Furthermore, the Court has never held that a jury may in no case be instructed to apply a national community standard in finding obscenity. *Ashcroft*, 535 U.S. at 588 (O'Connor, J., concurring in part and concurring in the judgment). To "avoid[ ] the need to examine the serious First Amendment problem that would otherwise exist," we construe obscenity as regulated by §§ 1462 and 1465 as defined by reference to a national community standard when disseminated via the Internet. *Id.* at 590 (Breyer, J., concurring in part and concurring in the judgment).[8]

---

[8]We recognize that Justice Kennedy's opinion, as well Justice Stevens's dissent, viewed a national community standard as not resolving the constitutional problem created by applying local community standards to define obscenity on the Internet. *Ashcroft*, 535 U.S. at 596; *id.* at 607 n.3. In their

**[9]** The Government argues our proposed holding is fore-
closed by our opinion in *United States v. Dhingra*, 371 F.3d
557 (9th Cir. 2004). *Dhingra* reviewed the constitutionality of
18 U.S.C. § 2422(b), which criminalizes enticement of a
minor to engage in criminal sexual activity. *Id.* at 561. The
defendant, who was convicted for enticing a minor through
the Internet, raised a First Amendment challenge asserting, in
part, that the statute was overbroad because it depended on
local criminal laws to define the criminal sexual activity that
falls within its ambit. *Id.* at 563. In rejecting this challenge,
we opined:

> That the persuasion of others for sexual activity
> occurs over the Internet offers no talismanic protec-
> tion from the established rule that the burden of
> complying with the statute rests with the person
> doing the persuading. The fact that various commu-
> nity standards might apply does not make the statute
> unconstitutional.

view, juries' application of a national community standard will inevitably
vary based on their own communal understanding and, therefore, a
national community standard will not produce actual uniformity. *Id.* Jus-
tice O'Connor, as well, was not willing to wholly foreclose the possibility
that a national community standard may still pose a constitutional prob-
lem. *Id.* at 589 (stating that application of a national community standard
"does not *necessarily* pose a First Amendment problem" (emphasis
added)). Our holding today does not preclude the possibility that a defen-
dant could successfully challenge the application of a national community
standard in defining Internet obscenity by demonstrating unconstitutional
variance persists or on any other grounds. We only follow the various
opinions in *Ashcroft* in holding that application of local community stan-
dards raises grave constitutional doubts on its face and application of a
national community standard does not, thereby persuading us to adopt a
national community standard to alleviate the former doubts. Our holding
that application of a national community standard to define Internet
obscenity does not raise grave constitutional doubts on its face is not to
be interpreted as a holding that any constitutional challenge to such appli-
cation will necessarily be meritless.

*Id.* at 564 (internal quotation marks and citations omitted). However, our analysis in *Dhingra* is inapplicable here because we found § 2422(b) did not regulate speech. *Id.* at 563 ("Because the statute regulates conduct, not speech, it is inappropriate to bootstrap our First Amendment jurisprudence into the context of criminal sexual contact."). To the extent *Dhingra*'s language could be broadly interpreted as applying to regulation of Internet speech, it is dictum and hence not controlling. Therefore, *Dhingra* does not preclude our reading of *Ashcroft*.

**[10]** In light of our holding, the district court's jury instructions defining obscenity pursuant to *Hamling* was error. However, this error does not require reversal because the district court's error was far from plain. "Error is plain where it is 'clear and obvious.' " *United States v. Recio*, 371 F.3d 1093, 1100 (9th Cir. 2004) (quoting *United States v. Fuchs*, 218 F.3d 957, 962 (9th Cir. 2000)). Prior to our holding here, the relevant law in this area was highly unsettled with the extremely fractured opinion in *Ashcroft* providing the best guidance. While our holding today follows directly from a distillation of the various opinions in *Ashcroft*, our conclusion was far from clear and obvious to the district court. Hence, we conclude that the district committed no reversible error in its §§ 1462 and 1465 jury instructions.

### B.    *Vagueness Challenge to 18 U.S.C. § 1037*

Defendants challenge their convictions for violation of 18 U.S.C. § 1037 on the ground that § 1037 is unconstitutionally vague both on its face and as applied to Defendants' conduct. Defendants previously raised their vagueness challenge in the district court. Therefore, we review the district court's determination of the constitutionality of § 1037 *de novo*. *United States v. Naghani*, 361 F.3d 1255, 1259 (9th Cir. 2004).

18 U.S.C. § 1037 was enacted as part of the Controlling the Assault of Non-Solicited Pornography and Marketings Act of

2003 ("CAN-SPAM Act"), Pub.L. No. 108-187, 117 Stat. 2699 (codified at 18 U.S.C. § 1037, 15 U.S.C. §§ 7701-7713). The CAN-SPAM Act was enacted to prevent senders of electronic mail from deceiving recipients "as to the source or content of such mail" and to ensure that recipients "have a right to decline to receive additional commercial electronic mail from the same source." 15 U.S.C. § 7701(b)(2)-(3). Defendants were convicted specifically under 18 U.S.C. § 1037(a)(3) and (a)(4). Section 1037(a)(3) provides:

> Whoever, in or affecting interstate or foreign commerce, knowingly— . . . . materially falsifies header information in multiple commercial electronic mail messages and intentionally initiates the transmission of such messages . . . shall be punished . . . .

18 U.S.C. § 1037(a)(3). Section 1037(a)(4) provides:

> Whoever, in or affecting interstate or foreign commerce, knowingly— . . . . registers, using information that materially falsifies the identity of the actual registrant, for five or more electronic mail accounts or online user accounts or two or more domain names, and intentionally initiates the transmission of multiple commercial electronic mail messages from any combination of such accounts or domain names . . . shall be punished . . . .

*Id.* § 1037(a)(4). "Initiates" is defined by statute as "to originate or transmit such message or to procure the origination or transmission of such message." 15 U.S.C. § 7702(9). The statute further provides that

> header information or registration information is materially falsified if it is altered or concealed in a manner that would impair the ability of a recipient of the message, an Internet access service processing the message on behalf of a recipient, a person alleg-

> ing a violation of this section, or a law enforcement agency to identify, locate, or respond to a person who initiated the electronic mail message or to investigate the alleged violation.

18 U.S.C. § 1037(d)(2). Defendants argue that the terms "impair" and "altered or concealed" as used in the statute's definition of "materially falsified" are unconstitutionally vague. They also assert an as-applied vagueness challenge claiming these terms gave them insufficient notice that the conduct they committed was illegal under § 1037. They do not raise a vagueness challenge as to any other terms in the statute.

**[11]** "Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment." *United States v. Williams*, 128 S. Ct. 1830, 1845 (2008). "Vague statutes are invalidated for three reasons: (1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of laws based on 'arbitrary and discriminatory enforcement' by government officers; and (3) to avoid any chilling effect on the exercise of First Amendment freedoms." *Humanitarian Law Project v. Mukasey*, 552 F.3d 916, 928 (9th Cir. 2009) (quoting *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998)) (internal quotation marks omitted). A statute is unconstitutionally vague as applied if it failed to put a defendant on notice that his conduct was criminal. *United States v. Purdy*, 264 F.3d 809, 811 (9th Cir. 2001). A statute is unconstitutionally vague on its face if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 128 S. Ct. at 1845. For statutes like § 1037 involving criminal sanctions "the requirement for clarity is enhanced." *Info. Providers' Coal. for the Def. of the First Amendment v. FCC*, 928 F.2d 866, 874 (9th Cir.1991). However, even applying this heightened requirement, "due process does not require impos-

sible standards of clarity." *Id.* (quoting *Kolender v. Lawson*, 461 U.S. 352, 361 (1983)) (internal quotation marks omitted).

### 1.   *As-Applied Challenge*

**[12]** We conclude Defendants' as-applied vagueness challenge fails even applying a heightened requirement of clarity. They had clear notice their conduct was a violation of § 1037(a)(3) and (a)(4). Defendants assert that they lacked notice that their actions would constitute "material falsification" under the statute. The terms Defendants regard as vague in the definition of material falsification are "impair," "altered," and "concealed." "When Congress does not define a term in a statute, we construe that term according to its ordinary, contemporary, common meaning." *United States v. W.R. Grace*, 504 F.3d 745, 755 (9th Cir. 2007) (quoting *United States v. Cabaccang*, 332 F.3d 622, 626 (9th Cir.2003) (en banc)) (alterations and internal quotation marks omitted). "Impair" is defined as: "to make worse : diminish in quantity, value, excellence, or strength : do harm to." Webster's Third New International Dictionary Unabridged 1131 (Philip Babcock Gove et al. eds., 1993). "Alter" is defined as "to cause to become different in some particular characteristic . . . without changing into something else." *Id.* at 63. "Conceal" is defined as "to prevent disclosure or recognition of : avoid revelation of : refrain from revealing : withhold knowledge of : drawn attention from : treat so as to be unnoticed." *Id.* at 469. In the headers of their bulk emails, Defendants intentionally replaced the email addresses from which the emails were sent with fictitious addresses. It is quite obvious that this constituted intentionally causing to be different or preventing the disclosure of the actual header information in a manner diminishing the ability of recipients to identify, locate, or respond to Defendants or their agents in violation of § 1037(a)(3). Defendants also intentionally replaced the actual phone and contact person for Ganymede with fictitious information. Again, it should have been clear to the Defendants that this constituted intentionally causing to be different or

preventing the disclosure of the actual domain name registration information in a manner diminishing the ability of a recipient to contact Defendants or their agents as the actual registrants of the domain name directly or through Ganymede.

[13] Defendants sole concrete argument in support of their as-applied challenge is that, with regard to their conviction under § 1037(a)(4), there was no attempt made by the Government to determine whether the email listed in their domain registration was inaccurate. Defendants assert that they had no notice under the terms of the statute that the intentional placing of a false contact person and phone number in their registration would constitute intentional impairment when the email listed may have been accurate. This argument is unpersuasive. As an initial matter, evidence was presented at trial that the email listed in the domain name registrations at issue was invalid. Even were this not the case, "impair" clearly is not synonymous with "completely obstruct." To impair, according to its plain meaning, merely means to decrease. It should have been clear to Defendants that intentionally falsifying the identity of the contact person and phone number for the actual registrant constitutes intentionally decreasing the ability of a recipient to locate and contact the actual registrant, regardless of whether a recipient may still be left some avenue to do so. We therefore conclude Defendants had notice that their conduct violated § 1037.

## 2. *Facial Challenge*

Defendants' facial vagueness challenge is similarly unavailing. We have held that "ordinarily a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Williams*, 128 S. Ct. at 1845 (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-495 & nn. 6-7 (1982)) (internal quotation marks and alterations omitted). However, "we have relaxed that requirement in the First Amendment context, permitting plaintiffs to

argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech." *Id.* We need not determine whether § 1037 regulates protected speech, thereby permitting Defendants' facial vagueness challenge, as in any case Defendants' challenge would be unsuccessful.

**[14]** In parallel to their as-applied challenge, Defendants' facial challenge rests on the claim that the term "impair" is so vague as to leave it to the complete discretion of police officers how the statute is enforced. We disagree. "Impair" is a broad term that potentially subjects a wide swath of conduct to regulation under § 1037. Nonetheless, as already discussed, it has a clear meaning that is not open to wholly subjective interpretation in the manner of other terms found to be unconstitutionally vague. *Cf. Kolender v. Lawson*, 461 U.S. 352, 358-61 (1983) (concluding that a penal statute requiring that a criminal suspect provide "credible and reliable" identification to police was unconstitutionally vague); *Smith v. Goguen,* 415 U.S. 566, 568-69, 581-82 (1974) (concluding that a statute criminalizing the act of "treat[ing] contemptuously" a United States flag was unconstitutionally vague). Furthermore, "impair" is closely analogous in meaning to terms previously upheld by the Supreme Court in the face of a vagueness challenge. In *Cameron v. Johnson*, 390 U.S. 611 (1968), the Court reviewed for vagueness a statute forbidding "picketing in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any county courthouses." *Id.* at 616 (internal quotations marks and alterations omitted). The Court found "[t]he terms 'obstruct' and 'unreasonably interfere' " were not unconstitutionally vague because they "plainly require no guessing at their meaning" and are "words of common understanding." *Id.* (internal quotation marks and alterations omitted). We see no basis to reach a different conclusion with regard to the similar term "impair."[9]

---

[9]By itself, the statute's failure to define a baseline of ability a recipient should have for locating an initiator of an email or actual registrant of a

**[15]** Defendants also argue that the definition of "material falsification" renders § 1037 unconstitutionally vague specifically as to whether it would criminalize private registration of a domain name. As testified to at trial, private registration is a service that allows registration of a domain name in a manner that conceals the actual registrant's identity from the public absent a subpoena. We fail to perceive any vagueness on this point. Based on the plain meaning of the relevant terms discussed above, private registration for the purpose of concealing the actual registrant's identity would constitute "material falsification." Defendants assert that many innocent people who privately register without the requisite intent may be subject to investigation for violation of § 1037 until their intent can be determined, allowing for abuse by enforcement authorities. This may be so, but it does not make the statute unconstitutionally vague. As we recently noted, " '[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is.' " *Shales*, 546 F.3d at 973 (quoting *Williams*, 128 S. Ct. at 1846). While determining as a factual matter whether the requisite intent for culpability under § 1037 exists may prove difficult, this does not demonstrate that the concept of intent as used in the statute is an entirely indeterminate, subjective one. Hence, the problem Defendants identify is irrelevant to the vagueness inquiry.

## C.    Clerical Error

**[16]** Defendants additionally claim there is a clerical error in the written judgment incorrectly labeling Defendants'

---

domain name could render the meaning of "impair" imprecise. However, any vagueness concerns this failure creates are obviated by the statute's requirement that any impairment to the recipient's ability be intentional to result in culpability. *See, e.g.*, *United States v. Wyatt*, 408 F.3d 1257, 1261 (9th Cir. 2005) ("A scienter requirement can help a law escape a vagueness problem."). By including this scienter requirement, the statute protects against arbitrary definition of what constitutes the baseline of ability from which impairment occurs.

Counts 1 through 3 convictions as Class D and E felonies. The written judgment as to Counts 2 and 3 references § 1037(b)(3) as the relevant penalty provision. Section 1037(b)(3) provides as a penalty "a fine under this title or imprisonment for not more than 1 year, or both." 18 U.S.C. § 1037(b)(3). The written judgment's reference to § 1037(b)(3) reflects the district court's prior determination that the jury was not instructed to make the requisite additional factual findings necessary for applying the more severe § 1037(b)(1) or (b)(2) penalty provisions. A crime punishable by a year or less in prison is classified as a misdemeanor. *See id.* § 3581(b). Hence, Defendants' Counts 2 and 3 convictions are properly classified as misdemeanors. Furthermore, because a conspiracy to commit a misdemeanor is a misdemeanor itself, *see id.* § 371, Defendants' Count 1 conviction is also properly classified as a misdemeanor. The Government does not cross-appeal the district court's determination that the appropriate penalty provision for Defendants' convictions was § 1037(b)(3). Therefore, we conclude the written judgment's classification of Counts 1 through 3 as Class D and E felonies is a clerical error requiring remand for correction. *See* Fed. R. Crim. P. 36; *Territory of Guam v. Gill*, 61 F.3d 688, 695 (9th Cir. 1995) (remanding case for correction of clerical error pursuant to Rule 36).

### D.    Challenge to Money Laundering Conspiracy Convictions

Defendants appeal their Count 8 convictions under 18 U.S.C. § 1956(h) for conspiracy to commit money laundering, asserting instructional error. As Defendants did not raise their objections to the § 1956 jury instructions in the district court, we review for plain error. *Peterson*, 538 F.3d at 1070. Though Count 8 of the Indictment charged the Defendants with conspiring to commit four different money laundering offenses, the jury was instructed that Defendants allegedly conspired to commit only one violation of 18 U.S.C. § 1956(a)(2)(B)(I). A person violates this provision if he

transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States . . . knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of *some form of unlawful activity* and knowing that such transportation, transmission, or transfer is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of *specified unlawful activity.*

18 U.S.C. § 1956(a)(2)(B)(i) (emphasis added). Section 1956 further provides that

the term "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that *constitutes a felony* under State, Federal, or foreign law.

*Id.* § 1956(c)(1) (emphasis added). Both the Indictment and jury instructions specify that the "some form of unlawful activity" was Defendants' conduct violating 18 U.S.C. § 1037(a)(3) and (a)(4) and that the "specified unlawful activity" was Defendants' conduct violating 18 U.S.C. §§ 1462 and 1465.

Defendants raise two interrelated assertions of instructional error. First, Defendants argue that if the court overturns its 18 U.S.C. §§ 1037, 1462, and 1465 convictions pursuant to the other aspects of its appeal, it must also reverse its § 1956(h) conviction because Defendants' § 1956(h) conviction relied

on a finding that Defendants' related activity was unlawful. As we do not sustain these other aspects of Defendants' appeal, we may reject this argument without further discussion.

**[17]** Second, Defendants argue that even if their 18 U.S.C. §§ 1037, 1462, and 1465 convictions are upheld, the fact that their 18 U.S.C. § 1037 convictions are properly categorized as misdemeanors, *see supra* Section II.C, requires reversal because § 1956 defines "some form of unlawful activity" as felonious activity. 18 U.S.C. § 1956(c)(1). We conclude that the district court's instruction was in error. The district court's Jury Instruction Number 46 on what constitutes a violation of § 1956(a)(2)(B)(i) included the following requirement:

> The person knows that the money represents the proceeds of some form of unlawful activity, in this case, the a [sic] violation of 18 U.S.C. § 1037(a)(3) or § 1037(a)(4) as set forth in Counts Two and Three of the Indictment[.]

The instruction further stated:

> To know that money involved in a financial transaction represents the proceeds of some form of unlawful activity, the person must know that the money represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law.

As set forth in the Indictment, Counts Two and Three included allegations of conduct that would warrant application of felony-level penalties under § 1037(b)(2). However, Jury Instructions Number 25 and 29 related to these counts state clearly that "[i]n order to prove the charge" for each the jury needed only to find conduct sufficient to support application of the misdemeanor level penalties under § 1037(b)(3). Such instructions allowed the jury to convict Defendants of

Count 8 by finding related activity that constituted only a misdemeanor violation of § 1037. We conclude it is unlikely that the jury interpreted the "as set forth in the Indictment" language in Jury Instruction Number 46 as requiring them to define a violation of § 1037(a)(3) and (a)(4) for purposes of finding a violation of § 1956 by reference to all the factual allegations made in Counts 2 and 3 of the Indictment. The jury more likely simply referred to Jury Instructions Number 25 and 29 to define a violation of those provisions for purposes of all counts. At a minimum, the instructions created serious ambiguity as to what was required. Furthermore, the instruction to the jury that the unlawful activity must be a felony could not have cured this error because there was no instruction given to the jury as to what was required to render a § 1037 violation a felony or as to whether any violation alleged in the Indictment was or was not a felony.

[18] Having determined there was error, we must determine whether it was plain. We find it is not, as it did not seriously affect the fairness, integrity or public reputation of the proceedings. *See Peterson*, 538 F.3d at 1072. Section 1037(b)(2)(C) provides for felony-level penalties "if . . . the volume of electronic mail messages transmitted in furtherance of the offense exceeded 2,500 during any 24-hour period, 25,000 during any 30-day period, or 250,000 during any 1-year period." 18 U.S.C. § 1037(b)(2)(C). This is the basis on which the Indictment charged felony violations of § 1037. Defendants' employees Jennifer Clason and Kirk Rogers each provided uncontradicted testimony that Defendants were transmitting emails in volumes well exceeding 250,000 in 2004. Hence, we conclude that the evidence at trial shows beyond a reasonable doubt that Defendants committed felony-level violations of § 1037. As a result, the instructional error identified by Defendants had no impact on the proceedings and therefore does not require reversal. *See Nash*, 115 F.3d at 1437.

### E.    Challenge to Obstruction of Justice Enhancement

Kilbride asserts that the district court's application of a two-level obstruction of justice enhancement to his sentence was error. "We review the district court's interpretation of the Sentencing Guidelines de novo" and its "findings of fact . . . for clear error." *United States v. Rivera,* 527 F.3d 891, 908 (9th Cir. 2008). Section 3C1.1 of the Sentencing Guidelines provides:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1. Among the examples of covered conduct described in the application notes is "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." *Id.* § 3C1.1, App. Note 4(a); *see United States v. Rising Sun*, 522 F.3d 989, 996 (9th Cir. 2008) ("Application notes . . . are treated as authoritative interpretations of the Sentencing Guidelines, unless they violate the Constitution or a federal statute or are inconsistent with, or a plainly erroneous reading of, the Guideline they are meant to interpret."). The district court found that Kilbride's securing of an order from the Mauritian court was an attempt to threaten or intimidate Law into not testifying at his trial and, therefore, warranted application of an obstruction of justice enhancement. We conclude the district court did not err in its application of the enhancement.

[19] The undisputed factual findings of the district court with regard to the timing of Kilbride's Mauritius lawsuit —

that it was filed mere days prior to Law's testimony when the documents underlying the action were disclosed to the defense in 2005 — fully support the district court's determination that the action was filed for the illegitimate purpose of preventing Law's testimony. Actions filed without legitimate purpose may qualify as unlawful harassment and hence constitute an attempt to intimidate or unlawfully influence a witness. *See United States v. Lewis*, 411 F.3d 838, 845-46 (7th Cir. 2005) (upholding application of 18 U.S.C. § 1514 to enjoin a civil lawsuit filed for illegitimate purposes as witness harassment); *United States v. Tison*, 780 F.2d 1569, 1571-73 (11th Cir. 1986) (same). Accordingly, the district court properly concluded that Kilbride's lawsuit was obstructive conduct justifying application of the enhancement.

## III.  Conclusion

We affirm Defendants' convictions and sentences. We remand to the district court to correct the clerical error in the written judgment describing Defendants' misdemeanor convictions under Counts 1 through 3 as felonies.

**AFFIRMED and REMANDED**