[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 02, 2010
JOHN LEY
ACTING CLERK

No. 08-15964

_____

D. C. Docket No. 07-00170-CR-T-24TBM

UNITED STATES OF AMERICA,

                                                    Plaintiff-Appellee,

versus

PAUL F. LITTLE,
a.k.a. Max Hardcore,
a.k.a. Max Steiner,
MAX WORLD ENTERTAINMENT, INC.,

                                                    Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(February 2, 2010)

Before BLACK, WILSON and COX, Circuit Judges.

PER CURIAM:

Appellants Paul Little and Max World Entertainment, Inc. appeal their convictions and sentences for the distribution of obscene materials in violation of 18 U.S.C. §§ 1461[1] and 1465 [2], on several grounds. They appeal: (1) denial of their motions to dismiss; (2) denial of their motions for judgment of acquittal; (3) allegedly improper comments by the government during closing argument; (4) allegedly improper jury instructions; (5) allegedly improper handling of juror irregularities; (6) failure of the judge to recuse herself; and (7) errors in sentencing. We find no merit to the Appellants' issues with the exception of the sentencing

---

[1]"Every obscene, lewd, lascivious, indecent, filthy or vile article, matter, thing, device, or substance . . . .

Is declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier.

Whoever knowingly uses the mails for the mailing, carriage in the mails, or delivery of anything declared by this section . . . to be nonmailable, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, or knowingly takes any such thing from the mails for the purpose of circulating or disposing thereof, or of aiding in the circulation or disposition thereof, shall be fined under this title or imprisoned not more than five years, or both, for the first such offense, and shall be fined under this title or imprisoned not more than ten years, or both, for each such offense thereafter." 18 U.S.C. § 1461.

[2]"Whoever knowingly produces with the intent to transport, distribute, or transmit in interstate or foreign commerce, or whoever knowingly transports or travels in, or uses a facility or means of, interstate or foreign commerce or an interactive computer service (as defined in section 230(e)(2) of the Communications Act of 1934) in or affecting such commerce, for the purpose of sale or distribution of any obscene, lewd, lascivious, or filthy book, pamphlet, picture, film, paper, letter, writing, print, silhouette, drawing, figure, image, cast, phonograph recording, electrical transcription or other article capable of producing sound or any other matter of indecent or immoral character, shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 1465.

enhancement for pecuniary gain over thirty thousand dollars ($30,000) which we find was assessed in error. Therefore, we affirm in part, reverse in part, and remand for re-sentencing in accord with our decision.

## I.

Appellants produced and sold videos of a sexually explicit nature. The materials they produced by were marketed online at sexually explicit websites that they created and maintained. In an investigation conducted by the Department of Justice, the contents of these websites were captured and copied. The investigation focused on the parts of the websites that posted trailers for videos being offered for sale by Appellants.[3] Counts one through five, which Appellants were convicted of pursuant to 18 U.S.C. § 1465, are based on five of these trailers.

As part of the investigation, the U.S. Postal Inspection Service office in Tampa ordered five DVD videos from the Appellants' websites.[4] The inspector entered a post office box in Tampa as her shipping address and the DVDs were subsequently shipped via U.S. mail. These five DVDs are the basis for counts six through ten for which the Appellants were convicted pursuant to 18 U.S.C. § 1461.

---

[3]The websites were hosted on servers in Tampa, Florida that belonged to Candid Hosting, Inc.

[4]According to the websites' standard online ordering procedure, the inspector was rerouted to a wholly independent website owned by an independent company, Jaded Video. Jaded Video is a separate company that Appellants employed to ship the obscene materials.

Appellants were each convicted on all ten counts of violating federal obscenity statutes. Little was sentenced to concurrent terms of forty-six months on all counts, a $7,500 fine, a $1,000 special assessment, and supervised release for a period of three years. Max World was sentenced to thirty-six months probation and a $75,000 fine.

## II.

*A.    The District Court Did Not Err in Denying Appellants' Motions to Dismiss*

"Denials of motions to dismiss the indictment are reviewed for abuse of discretion, but underlying legal errors . . . are reviewed *de novo*." *United States v. Robison*, 505 F.3d 1208, 1225 n.24 (11th Cir. 2007) (citations omitted). Appellants moved to dismiss their indictments on two grounds. First, Appellants argued that 18 U.S.C. §§ 1461 and 1465 are unconstitutional. Second, they argued that the *Miller v. California* obscenity test could not be applied to materials published on the Internet. 413 U.S. 15, 24, 93 S. Ct. 2607, 2615 (1973). The *Miller* test states that to determine whether a work is obscene the trier of fact must ask: "(a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest, (b) whether the work depicts or describes , in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as

4

a whole, lacks serious literary, artistic, political, or scientific value." *Id.* We find

no merit to either of these arguments.

> 1. *The Appellants' Obscenity Convictions Do Not Invade Any Constitutionally Protected Rights*

Appellants argue that the federal obscenity statutes are unconstitutional

because they violate a substantive due process right of sexual privacy protected by

the Fourteenth Amendment.[5] However, "obscene material is unprotected by the

First Amendment." *Miller*, 413 U.S. at 23, 93 S. Ct. at 2614 (citation omitted).

And neither the Supreme Court nor this Circuit has ever ruled that the government

is precluded from regulating obscene materials passing in interstate commerce.

*United States v. Orito*, 413 U.S. 139, 143, 93 S. Ct. 2674, 2678 (1973) ("[W]e

cannot say that the Constitution forbids comprehensive federal regulation of

interstate transportation of obscene material . . ."); *United States v. Reidel*, 402

U.S. 351, 354, 91 S. Ct. 1410, 1412 (1971) ("[T]he States retain broad power to

regulate obscenity . . ."); *see also Lofton v. Sec'y Dep't Children and Family*

*Servs.*, 358 F.3d 804, 815–17 (11th Cir. 2004) (finding a Florida statute that

prevented adoption by same-sex couples constitutional in part because *Lawrence v.*

---

[5]Appellants cite *Lawrence v. Texas*, 539 U.S. 558, 578–79, 123 S. Ct. 2472, 2484 (2003), to support their theory that the Supreme Court has established a right of sexual privacy. However, *Lawrence* was limited to the issue of "whether the petitioners were free as adults to engage in the *private conduct* in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment to the Constitution." *Id.* at 564, 123 S. Ct. at 2476 (emphasis added).

*Texas*, 539 U.S. 558, 564, 123 S. Ct. 2472, 2476 (2003), did not create a new fundamental right of sexual privacy). We find no merit to Appellants' argument that the federal obscenity laws are unconstitutional.

2. *The Test for Obscenity Established in* Miller v. California *Remains Applicable to Materials Published on the Internet*

The Miller obscenity test remains the standard for defining obscenity, regardless of the medium in which the materials are conveyed. *See* 413 U.S. at 24, 93 S. Ct. at 2615. Appellants argue that the Miller test is unworkable with regards to materials published on the Internet for two reasons. First, the contemporary community standards approach under Miller infringes upon First Amendment rights when applied to the Internet. Second, the requirement under the Miller test that the materials in question be taken as a whole is impossible to apply to materials found on the Internet.

a. *The District Court Did Not Err in Applying a Local Community Standard*

Appellants argue, as many others recently have,[6] that a local community

---

[6] *See Ashcroft v. ACLU*, 535 U.S. 564, 587, 122 S. Ct. 1700, 1714 (2002) (O'Connor, J., concurring) ("[A]doption of a national standard is necessary in my view for any reasonable regulation of Internet obscenity."); *Id.* at 589, 122 S. Ct. at 1715 (Breyer, J., concurring) ("I believe that Congress intended the statutory word 'community' to refer to the Nation's adult community taken as a whole, not to geographically separate local areas."); *United States v. Kilbride*, 584 F.3d 1240, 1254 (9th Cir. 2009) ("[A] national community standard must be applied in regulating obscene speech on the Internet, including obscenity disseminated via email.").

6

standard is not the proper approach for judging Internet-based materials. The growing discord has arisen from the belief that the transmission of materials over the Internet is inherently different from the traditional, concrete, real world conveyance of materials. *See Ashcroft v. ACLU*, 535 U.S. 564, 595, 122 S. Ct. 1700, 1718 (2002) (Kennedy, J., concurring) ("Indeed, when Congress purports to abridge the freedom of a new medium, we must be particularly attentive to its distinct attributes, for differences in the characteristics of new media justify differences in the First Amendment standards applied to them." (quotation and citation omitted)). When Appellants published their materials on the Internet the materials immediately became available to anyone in the world with Internet access. *See id.* at 595, 122 S. Ct. at 1719 (Kennedy, J., concurring) ("[I]t is easy and cheap to reach a worldwide audience on the Internet, but expensive if not impossible to reach a geographic subset." (citations omitted)). Even if Appellants live in an area that is widely open[7] to sexually explicit materials, these materials are equally accessible to individuals in the strictest corners of our nation.[8] *See id.* at 595–96, 122 S. Ct. at 1719 (Kennedy, J., concurring) ("A Web publisher in a

---

[7]We do not claim to know if the community where Appellants conducted their Internet publishing was accepting of the materials in question, but merely posit the statement for purposes of argument.

[8]Of course, the materials would also be available to individuals all over the world, but for the purposes of analyzing federal statutes we confine our concern to the communities located within the borders of the United States.

community where avant garde culture is the norm may have no desire to reach a national market; he may wish only to speak to his neighbors; nevertheless, if an eavesdropper in a more traditional, rural community chooses to listen in, there is nothing the publisher can do.").

Appellants argue that their publication was different from that of the appellant in *Miller* in that they did not direct their Internet publication at any one area. *Miller*, 413 U.S. at 16, 93 S. Ct. at 2611 (appellant purposefully and knowingly mailed advertisements for obscene materials). Appellants argue that applying a local community standard to the Internet results in an infringement upon First Amendment rights because the Internet publisher's materials can be judged according to the community standards of the strictest of communities, even though the Internet publisher never made any specific effort to direct the materials at that community.[9]

---

[9]Ironically, the *Miller* contemporary community standard was established to protect the First Amendment rights of those in the sexually open areas of our country just as much as it was designed to protect the people in the strictest areas. *Miller*, 413 U.S. at 30–34, 93 S. Ct. at 2618–2620. *Miller* declared that it is "neither realistic nor constitutionally sound to read the First Amendment as requiring that the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las Vegas, or New York City," 413 U.S. at 32, 93 S. Ct. at 2619, which means the opposite must also hold true, that the people of Las Vegas and New York City must not be constrained in their First Amendment freedom of expression by the standards of those in Maine or Mississippi. *See Ashcroft*, 535 U.S. at 597, 122 S. Ct. at 1719 (Kennedy, J., concurring) ("[I]t is neither realistic nor beyond constitutional doubt for Congress, in effect, to impose the community standards of Maine or Mississippi on Las Vegas and New York."). The problem we encounter today is due in part to the fact that the Court in the time of *Miller* could not envision the amorphous and viral nature of the internet.

Appellants argue that the district court should have applied a national or Internet community standard rather than the local community standard of the Middle District of Florida. In support of this argument, Appellants rely heavily on the concurrences and dissent in *Ashcroft*, 535 U.S. 564, 586–612, 122 S. Ct. 1700, 1714–1728 (2002). Recently, the Ninth Circuit interpreted *Ashcroft* in such a way as to mandate a national community standard for Internet-based material. *United States v. Kilbride*, 584 F.3d 1240, 1252–54 (9th Cir. 2009). We decline to follow the reasoning of *Kilbride* in this Circuit. The portions of the *Ashcroft* opinion and concurrences that advocated a national community standard were dicta, not the ruling of the Court.[10]

As a result, the *Miller* contemporary community standard remains the standard by which the Supreme Court has directed us to judge obscenity, on the Internet and elsewhere. The district court did not err when it instructed the jury to

---

[10]"I agree with the plurality . . . . I write separately to express *my views* on the constitutionality and *desirability* of adopting a national standard for obscenity for regulation of the Internet." *Ashcroft*, 535 U.S. at 586, 122 S. Ct. at 1714 (O'Connor, J., concurring) (emphases added); "And in *future* facial challenges to regulation of obscenity on the Internet, litigants may make a more convincing case for [a national community standard]." *Id.* at 587, 122 S. Ct. at 1714 (O'Connor, J., concurring) (emphasis added); "While I would *prefer* that the Court resolve the issue before it by explicitly adopting a national standard for defining obscenity on the Internet, given respondents' failure to demonstrate substantial overbreadth due solely to the variation between local communities, I join . . . the judgment." *Id.* at 589, 122 S. Ct. at 1715 (O'Connor, J., concurring) (emphasis added); "[W]e need not decide whether the statute invokes local or national community standards to conclude that vacatur and remand are in order." *Id*. at 596, 122 S. Ct. at 1719 (Kennedy, J., concurring).

judge the materials on the basis of how "the average person of the community as a whole—the Middle District of Florida—would view the material." Doc. 222 at 28.

>    b.    *The District Court Properly Presented the Materials "As a Whole"*

The *Miller* requirement that materials be "taken as a whole" was properly applied to the materials at issue in this case. In two of its three steps, the *Miller* test includes the caveat that materials being judged for obscenity must be "taken as a whole." 413 U.S. at 24, 93 S. Ct. at 2615. First, the jury must consider the materials "as a whole" when determining whether the material appeals to the prurient interest. *Id.* Second, the jury must view the material "as a whole" to determine whether the material has any "serious literary, artistic, political, or scientific value." *Id.* The "taken as a whole" language in *Miller* serves two purposes: (1) it places materials in their proper context so that a jury may properly determine if the material is truly of prurient appeal; and (2) it ensures that any literary, artistic, political, or scientific value endowed in the material by its surrounding context is not lost by viewing the material in isolation.

Appellants argue that the Internet video trailers should have been viewed in the context of the entire website in which they were published. If the website in which material is found does not alter the determination of its prurient appeal or

10

add some redeemable quality to the work, then the website is not necessary for the

"taken as a whole" analysis.[11]  Appellants provided neither the district court nor

this Court with any reason to believe that the websites in which the five video

trailers were published would change the way a reasonable juror would judge or

view the video trailers.  The district court did not err in presenting the five video

trailers to the jury as five separate works each to be judged in and of themselves.

C.     *The Government Presented Sufficient Evidence to Establish Each Element of Its Case*

The district court did not err in denying Appellants' motions for judgment of

acquittal.  "We review the sufficiency of the evidence de novo, viewing the

evidence in the light most favorable to the government and accepting all reasonable

inferences in favor of the verdict."  *United States v. Mendez*, 528 F.3d 811, 814

(11th Cir. 2008) (per curiam) (citation omitted).  Appellants argue that the district

court should have granted their motions on three grounds: (1) that the government

failed to meet its burden of proof because only excerpts of the DVDs were

published to the jury; (2) that the government failed to prove that Appellants knew

the United States mail would be used to ship the DVDs; (3) that the government

did not provide sufficient evidence as to Appellants' knowledge of venue for the

---

[11]If an art critic were asked to judge the quality of the Mona Lisa he would not consider
the Louvre part of the work.

11

convictions under 18 U.S.C. § 1461.

1. *A Sufficient Portion of the Materials was Presented During the Government's Case-in-Chief*

There was sufficient evidence presented during the government's case-in-chief to meet the government's burden of proving obscenity in the DVDs. The government published excerpts of the DVDs to the jury as allowed by the district judge. We need not determine whether the excerpts alone would have been sufficient to meet the government's burden of proof because Appellants published the DVDs in their entirety during their cross examination of the government's witness. The evidence presented to the jury was sufficient to meet the government's burden of proving that the DVDs contained obscene material.

2. *The Government Presented Sufficient Evidence of Appellants' Knowledge of the Use of the United States Mail*

The government also presented sufficient evidence that Appellants were aware that the United States mail had been used to distribute the DVDs. "Where one does an act with knowledge that the use of the mails will follow . . . or where such use can reasonably be foreseen . . . then he 'causes' the mails to be used." *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S. Ct. 358, 363 (1954) (citation omitted). The government introduced evidence showing that Appellants were: (1) producing DVDs for sale throughout the United States (the DVDs were advertised

on the Internet without any restriction on who could order the DVDs); and (2) Appellants contracted with an independent distributer, Jaded Video, to process payment and ship the DVDs. We find that based on the evidence presented Appellants could have reasonably foreseen the use of the United States mail by Jaded Video.

### 3. *The Government was Not Required to Prove Knowledge of Venue*

The government was not required to prove that Appellants had knowledge of venue. Knowledge of venue is not an element of 18 U.S.C. § 1461. The government presented sufficient evidence during its case-in-chief, and the district court did not err in denying Appellants' motion for judgment of acquittal.

### D. *Government Comments Did Not Infringe the Appellants' Right to a Fair Trial*

When an appellant properly objects during trial to the government's comments we look to whether the government's comment was improper and whether it prejudiced a substantial right of the defendant. *United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997). However, if the appellant did not object we ask whether the comments were plain error "so obvious that failure to correct it would jeopardize the fairness and integrity of the trial." *Id.* The prosecutor in the present case did not make any comments that rose to the level of prejudicing any substantial rights of Appellants. Appellants' right to a fair trial was not infringed

13

by any of the government's statements during trial.

*E.     The District Court Did Not Err in Instructing the Jury*

The district court's refusal to give a requested jury instruction is reviewed for abuse of discretion. *United States v. Trujillo*, 146 F.3d 838, 846 (11th Cir. 1998). First, the district court did not abuse its discretion in instructing the jury that, "[t]o cause the mails to be used is to do an act with knowledge that the use of the mails will follow in the ordinary course of business or where such use can reasonably be foreseen." Doc. 222 at 24–25. The Supreme Court has ruled that the element of knowledge of the use of the mail in 18 U.S.C. § 1461 can be established by a reasonable foreseeability. *Pereira*, 347 U.S. at 8–9, 74 S. Ct. at 363.[12] Therefore, the district court's instruction concerning use of the mail was proper.

Second, the district court also did not abuse its discretion in refusing to instruct the jury that the government must prove Appellants knew the materials

---

[12]*Pereira* involved a mail fraud statue, 18 U.S.C. § 1341, not the obscenity statute at issue in this case, 18 U.S.C. § 1461. 347 U.S. at 3. Neither the Supreme Court nor this Court has expressly held that the reasonable-foreseeability standard announced in *Pereira* applies equally in the context of § 1461. Nevertheless, this Circuit's pattern jury instructions indicate that an individual "causes" the use of the mail under § 1461 when he has "knowledge that the use of the mails will follow in the ordinary [course] of business or where such use can reasonably be foreseen." *Eleventh Circuit Pattern Jury Instructions (Criminal)* 53 (2003) (emphasis added). Because the causation elements of § 1341 and § 1461 are not meaningfully distinguishable from one another, the *Pereira* standard applies equally in the § 1461 obscenity context, as reflected in Instruction 53. Other circuits have held likewise. *See, e.g.*, *United States v. Kussmaul*, 987 F.2d 345, 350 (6th Cir. 1993); *United States v. Kuennen*, 901 F.2d 103, 104–05 (8th Cir. 1990).

were legally obscene.  The government is not required to show that the Appellants knew of the illegality of the materials in question, merely that they knew the "character and nature of the materials."  *Hamling v. United States*, 418 U.S. 87, 123, 94 S. Ct. 2887, 2910 (1974).

Finally, the district court did not err in refusing to instruct the jury to consider a national or Internet standard in determining community standards.  As we have already discussed, a local community standard is still proper under *Miller*.

F.      *The District Court Acted Within Its Discretion in Resolving Several Juror Irregularities*

The district court did not err in its handling of three juror irregularities that arose during trial.  The district court's handling of juror irregularities is reviewed for abuse of discretion.  *United States v. Polar*, 369 F.3d 1248, 1253 (11th Cir. 2004).  Appellants argue that their Sixth Amendment right to a fair and impartial jury was violated by three situations and the district court's handling of these situations.  First, an alternate juror sent a note to the district judge requesting to view only portions of the DVDs, rather than the entirety of the DVDs.  Second, an Assistant United States Attorney ("AUSA") spoke to a person he later discovered to be a juror, asking the juror whether he was going upstairs to "watch that porn." Third, the district court received a note from a juror stating that she had been fired

15

from her job and decided to address the matter after the jury returned a verdict.

     1.     *There is No Reason to Believe That the Alternate Juror's Note to the Judge Tainted the Remainder of the Panel*

Appellants contend that because the alternate juror wrote the note in the jury room, other jurors may have seen it, thus leading some of the jurors to pre-judge the issue of obscenity. The district judge questioned the alternate juror and determined that there was no harm in allowing the juror to remain. Appellants' argument that the note prejudiced their Sixth Amendment rights is based on nothing more than mere speculation, and as such we find no merit to this argument.

     2.     *The Off-Hand Remark by the AUSA Did Not Violate the Appellants' Constitutional Rights*

The comment from the AUSA did not prevent Appellants from receiving a fair trial. The AUSA was not involved in the prosecution of Appellants, he did not identify himself as an AUSA, and the AUSA did not know the person was a juror. Appellants did not request the district judge to voir dire the juror or give a cautionary instruction. The district court, in its ample discretion, determined that the juror was not improperly influenced by this one comment and investigated no further. We find that, while interviewing the juror may have been advisable in an abundance of caution, the district court's failure to do so was not an abuse of its discretion.

16

3.    *The District Court Did Not Err in Its Dealings with a Juror Who was Allegedly Fired for Her Service on the Jury*

The Appellants were not deprived of a fair trial when the district judge

waited until after the verdict to address the situation involving a juror who had

been fired during the trial.  Appellants note that the juror was crying when the

verdict was read and argue that this is proof that her termination from her job

influenced her ability to deliberate, thus depriving Appellants of a fair trial.  Once

again the Appellants base their argument on pure speculation.  There is no

evidence that the fact that the juror was fired affected her decision during

deliberations.[13]

G.    *There Was No Basis for the Appellants' Request that the District Judge be Recused*

The Appellants' arguments that the district judge should have recused

herself are meritless.  The district judge's refusal to recuse herself is reviewed for

abuse of discretion.  *United States v. Berger*, 375 F.3d 1223, 1227 (11th Cir. 2004)

(per curiam).  Appellants did not timely file an affidavit providing facts to establish

the district judge's bias or prejudice against them sufficient to comply with 28

U.S.C. § 144.  A judge must also recuse himself or herself if his or her

---

[13]Jurors are protected by federal law from any adverse actions taken by their employer as a result of their service on a jury.  28 U.S.C. § 1875.  Any report that an employer has taken adverse action due to jury service is an allegation that would properly give rise to an investigation by proper authorities.

"impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Appellants argue that certain comments the judge made, outside the presence of the jury, brought the judge's impartiality into question. We find no merit to this argument.

H.     *The District Court Properly Applied a Sentencing Enhancement for Sado-Masochism, but Erred in Assessing a Point for Derived Income Over $30,000*

"We apply a two-pronged standard to review claims that the district court erroneously applied sentencing guidelines adjustments. First, we review the factual findings underlying the district court's sentencing determination for clear error. We then review the court's application of those facts to the guidelines *de novo*." *United States v. Williams*, 527 F.3d 1235, 1247–48 (11th Cir. 2008) (internal citations omitted).

1.     *The Sado-Masochism Enhancement was Proper*

The district court did not err in applying a sentencing enhancement for sadistic, masochistic, or other violent depictions. The relevant section of the United States Sentencing Guidelines ("U.S.S.G.") states that an enhancement is proper "[i]f the offense involved material that *portrays* sadistic or masochistic conduct or other depictions of violence." U.S.S.G. § 2G3.1(b)(4) (emphasis added). It does not matter if the persons depicted in the materials actually were sadists or masochists or whether they were actually harmed. The focus of the

18

enhancement is whether the material portrays such conduct. In this case, there is no doubt that the trailers on Appellants' websites and the DVDs portrayed sadistic and masochistic conduct. The district court did not err in applying this enhancement.

2. *The Point Assessed for Income Earned Over $30,000 was Improper*

The district court erred when it considered pecuniary gain derived from sales of the DVDs outside the Middle District of Florida. The U.S.S.G. states that if there is any pecuniary gain, the offense level must be increased by five points. U.S.S.G. § 2G3.1(b)(1)(A). Thereafter, any additional increase in the offense level due to pecuniary gain is dictated by the table in U.S.S.G. § 2B1.1(b)(1)(D). *Id.* The district court adopted the Pre-Sentence Report ("PSR") which found, "between January 1, 2005 and June 25, 2008, the [Appellants] sold 734 of the [charged] DVDs for a total retail value of $40,340.50." Little PSR at 45; Max World PSR at 46. According to the U.S.S.G., the Appellants' offense level was increased by six points because there was a total pecuniary gain of over thirty thousand dollars ($30,000) from the DVDs. U.S.S.G. § 2B1.1(b)(1)(D).

The U.S.S.G. says that the court may consider all relevant conduct, which is defined as "all acts and omissions . . . by the defendant . . . . that occurred during the commission *of the offense* of conviction, in preparation *for that offense*, or in

19

the course of attempting to avoid detection or responsibility for that offense."

U.S.S.G. § 1B1.3(a)(1)(A)–(B) (emphasis added). Clearly, relevant conduct must be connected directly to the offense for which Appellants were convicted, the transmission and sale of obscenity *in the Middle District of Florida*. The district court directed the jury to use the community standards of the Middle District of Florida in determining whether the DVDs were obscene. Thus, the DVDs have only been established as illegal obscenity in the Middle District of Florida.

Neither the district court nor the PSR made any findings related to the geographic location from which the $40,340.50 was derived. There was no evidence presented at sentencing that these funds were derived from sales inside the Middle District of Florida. The only evidence of any pecuniary gain earned by Appellants in the Middle District of Florida was the amount paid by the postal inspector for the DVDs forming the basis for counts six through ten.

While the sales of these DVDs in areas outside the Middle District of Florida are essentially the same conduct as the sale to the inspector inside the Middle District of Florida, they differ in one very critical way: they are not illegal sales of obscenity (at least not yet). Sales of pornographic materials do not come to the fruition of being illegal obscenity until a jury determines that it is obscenity according to its community standards. The DVDs at this point have only been

20

found to be obscene and illegal in the Middle District of Florida.

Consistency demands that if a district court uses a local community standard then the pecuniary gain derived from the obscenity should be limited to the area defining those local community standards. Appellants' sentences are being increased for sales in areas that could have community standards that deem the DVDs not to be obscene. Thus, when dealing with the DVDs in areas outside the Middle District of Florida, we must treat them as speech protected by the First Amendment until otherwise determined. Increasing Appellants' sentences for pecuniary gain in areas where the DVDs have not yet been proven to be obscene comes dangerously close to a violation of Appellants' First Amendment rights. We find that the one point increase in Appellants' offense level for pecuniary gain over thirty thousand dollars was error. Therefore, we vacate the sentence and remand for re-sentencing.

## III.

The Appellants' convictions are affirmed. Their sentences are vacated and remanded for re-sentencing in accordance with our decision.

**AFFIRMED IN PART, REVERSED IN PART, REMANDED FOR RE-SENTENCING.**